OPINION
{¶ 1} Tyrone Reid appeals from his murder conviction in the death of Cedron Brown and the gun specification accompanying the charge. Reid was acquitted of the felony murder of William Thomas and an aggravated robbery charge.
 {¶ 2} On March 25, 2001 Billy Thomas and Cedron Brown were shot to death at 523 Delaware Avenue in the City of Dayton. Dayton police were dispatched around 11:40 p.m. to 524 Delaware Avenue, where residents there directed the officers across the street to 523 Delaware. The residents of 524 Delaware advised officers that someone left the 523 residence and headed northbound on Linda Vista. Officer Dan Mamula observed footprints in the snow heading northbound on Linda Vista that led to the alley behind 523 where Billy lay bleeding from gunshot wounds. Billy told Mamula that he was shot four times, but he did not know who had shot him. Cedron was found dead on a couch in the living room of the Delaware residence.
 {¶ 3} The residents of 524 Delaware said a possible suspect left the scene in a red Grand Am automobile. Officer David Matthews participated in the apprehension of this vehicle. Matthews removed the passenger from the vehicle, Jabree Yates, who stated to him "a guy had just shot his friend and that he had taken the gun and, in turn, shot him." A gun was recovered from the front passenger side floorboard, and a baggie of crack cocaine was taken from Jabree's pocket.
 {¶ 4} The apartment at 523 Delaware was the residence of Deatra Ragland and Damien Adams. Jabree and Cedron were friends of Damien and spent a good deal of time at Damien's residence. Deatra admitted that these friends of Damien were in the drug trade, and sold drugs out of 523 Delaware.
 {¶ 5} Damien testified that some guys in a house across the street on Linda Vista sold drugs, with which Jabree and Cedron had a problem with a couple days prior to this incident. He also testified that he told the dispatcher in the 911 call that the guys across the street may be the ones who broke into his house.
 {¶ 6} Damien and Deatra left Jabree, Cedron, Billy Thomas and Tyrone in the living room when they retired to their bedroom earlier in the evening. Damien and Deatra claimed to be in bed when they suddenly heard a gunshot. The two of them jumped out the bedroom window and ran to a neighbor's house to call 911.
 {¶ 7} Damien estimates that his brother, Robert Essex, had left his apartment approximately fifteen minutes prior to hearing the gunshot. Essex recalled that he was at the house between 10:30 and 10:45 p.m. that evening, and stayed approximately 15 minutes. Essex testified that he saw four young men with the person he knew was Cedron. Essex claimed to know everyone in the house, except the person he came to know as Billy. The police report indicated Mr. Essex could give little description of anyone in the house, most notably Tyrone whom he did not name.
 {¶ 8} The key witness for the State was Jabree Yates. Yates testified he was watching television with Cedron, Billy, and Reid in the living room when he fell asleep. He testified he awoke when he heard a gunshot. He testified Reid was pointing a gun away from Cedron and him and then Reid and Billy Thomas rushed him.
 {¶ 9} Yates testified that the three scuffled and Reid ordered him to "give me that shit" and he removed what money he had from his pockets and threw the money at Reid. Yates testified that Reid then gave his gun to Billy, said he'd return, and then left the house through the front door. Yates testified he then tried to talk Billy out of the gun he was holding on him. Yates said he struggled with Billy and got it away from him. Yates said Billy told him he had not shot Cedron. Yates said Tyrone started climbing back into the apartment through a bedroom window armed with a shotgun. Yates testified he shot at Reid who disappeared out the window. Yates said he shot at Billy Thomas as he tried to exit the bedroom window. Thomas collapsed in a nearby yard and died from gunshot wounds.
 {¶ 10} Police recovered a wad of cash on the living room floor where Yates said he threw it and they also recovered Reid's red and black sweater which was hanging on the bedroom window frame and a shotgun just below the window.
 {¶ 11} Tyrone Reid and Billy Thomas were first cousins, and Reid called Billy's mother to tell her that Billy had been shot. Reid met the family at the hospital. Sgt. Gary White of the Dayton Police Department had arrived, and he testified that Tyrone and his mother agreed to come downtown for an interview. After having been advised of his rights, Tyrone told Det. Doyle Burke that he had dropped Billy Thomas off at 523 Delaware and then had gone on to his girlfriend's house, where he stayed for awhile. Eventually he said he went back to 523 Delaware, walked past the front door to the open window, where he saw Jabree Yates holding a gun. He said Yates fired at him but missed, and he left. He refused to give his girlfriend's name. He said he didn't know her address but he thought he could probably find the house for them, although, he said, that would be futile, since she was not at home.
 {¶ 12} Reid's mother, Jackie Davidson, gave a different account of events at Good Samaritan Hospital. She testified that Sergeant White approached her and said her son needed "to come downtown to pick a picture — go through a mug shot book." Ms. Davidson said she went to the police department with her son but was not permitted to be with him during the interview.
 {¶ 13} White admitted he was aware of Yates' statement before he asked Reid to come down to the police department and that his goal was to get a statement from the defendant. He denied his mother objected to being separated from her son at the police department.
 {¶ 14} Damien testified that Cedron was friends with Billy and Tyrone. Tyrone's mother, Jackie Davison also said that they were both very good friends with Cedron. Harry Calloway, a school counselor at Colonel White High School and a chaplain at the county jail, testified that Cedron was like a son to him. He explained that Cedron was very close with Tyrone, and that they acted like family.
 {¶ 15} In his first assignment, Reid contends his conviction was against the manifest weight of the evidence. Reid argues that it makes no sense that he would kill his best friend. Also he points out that there was evidence that Yates and Cedron had a recent dispute with drug dealing neighbors. Also he points out that Deatra Ragland contradicted Yates' testimony that Cedron was killed first because she heard Cedron screaming as she left the house and a shot was fired.
 {¶ 16} The States argues that the jury verdict was not against the manifest weight of the evidence because there was corroborating evidence to support Yates' testimony, namely the money on the floor, the defendant's shirt and the shotgun found where Yates said the defendant tried to re-enter the house.
 {¶ 17} In deciding whether a verdict is supported by the weight of the evidence, the court reviews the entire record, weighs the evidence and all reasonable inferences, considers the credibility of the witnesses, and determines whether in resolving conflicts in the evidence the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.State v. Thompkins (1997), 78 Ohio St.3d 380.
 {¶ 18} Although we sit as a thirteenth juror on resolving manifest weight assignments, some deference must be accorded the jurors who observed first-hand Yates' testimony and those of the other witnesses. On careful consideration, we cannot say the jury lost its way in convicting the defendant of the murder of Cedron Brown. The first assignment of error must be overruled.
 {¶ 19} In his second assignment, Reid argues that the trial court erred in denying his motion to suppress statements to the police at the police station. Reid argues that his statements should have been suppressed because he was only 16 years of age and he was tricked by Sergeant White into going to the police department to look at mug shots, not be interviewed concerning his involvement in the homicide.
 {¶ 20} In denying Reid's pre-trial motion, the trial court made the following findings:
 {¶ 21} "Here, Defendant was advised of his Miranda rights by Detective Burke. Before going over the rights, Detective Burke determined that Defendant was 16 years of age, had nine years of education, could read and write, had been advised of his rights previously, was familiar with DYS (Department of Youth Services) and the Family Court Center (the juvenile court). Defendant was also aware (from State's Exhibit 1, the pre-interview form) that the interrogation concerned a charge of murder. To verify that Defendant could read, Detective Burke had Defendant read each right aloud, which Defendant did. Defendant told Detective Burke that he understood each right and that he understood the waiver. Defendant made his mark (presumably signature) on the waiver signature line.
 {¶ 22} "Regarding other considerations, the interview commenced at 3:45 a.m. and was very brief, according to the testimony of Detective Burke. There was only one interview as Defendant chose to terminate it when Detective Burke wanted to `clear up' some items. Defendant also understood he was not required to answer questions when Defendant refused to give the name and address of his girlfriend. Detective Burke did not inquire into Defendant's last sleep, food or drink, but there was no evidence of the possibility of any physical deprivation that would render Defendant's statements involuntary.
 {¶ 23} "Regarding inducement, threat or promises, there was no direct or cross-examination questions of Detective Burke regarding these matters. No evidence of these matters was raised by Defendant.
 {¶ 24} "Finally, regarding Defendant's emotional stability and mental capacity, there was no evidence that Defendant was emotionally distraught or crying. The Court finds from this record, based on Defendant's age (nearly 17), his educational level, his admitted ability to read, and his understanding (and invocation) of his Miranda rights, that the Defendant gave no appearance of impaired mental capacity.
 {¶ 25} "The State must prove by a preponderance of the evidence that a confession is voluntary. Lego v Twomey (1978), 404 U.S. 477. In making that determination, the Court must consider the totality of the circumstances. State v. Barker, supra.
 {¶ 26} "Based on the Court's review of the totality of the circumstances presented by the record before the Court, the Court finds that Defendant's decision to waive his privilege against self-incrimination was made voluntarily, and the Court finds that Defendant's will was not overborne and his capacity for self-determination was not critically impaired by coercive police conduct. See State v. Otte (1996), 74 Ohio St.3d 555."
 {¶ 27} The State argues that the trial court correctly overruled the defendant's suppression motion because the State had demonstrated that Reid fully understood his constitutional rights, voluntarily spoke to the police, and even ended his interview by invoking his right to consult an attorney.
 {¶ 28} Juveniles are entitled to protection from self-incrimination under the Fifth Amendment, and are therefore entitled to Miranda warnings. In re Gault (1967), 387 U.S. 1. A juvenile may waive his Fifth Amendment rights with or without parental consent so long as the totality of the circumstances of the waiver including the age of the juvenile, show the waiver is knowingly, intelligently and voluntarily made. Fare v, Michael C. (1979), 442 U.S.707; In re Watson (1989),47 Ohio St.3d 86, 89-90. Whether there is parental acquiescence, or the lack thereof, in the interrogation is one factor to consider in the totality of the circumstances. In the Matter of Willie Lee (Dec. 17, 1992), Cuyahoga App. No. 63858, citing State v. Bobo (1989),65 Ohio App.3d 685. The validity of a waiver of constitutional rights by a minor needs to be carefully examined. In re Greer (Sept. 17, 1992), Cuyahoga App. No. 63037.
 {¶ 29} The record supports the trial court's factual findings that Reid understood and waived his Miranda rights. The evidence also supports the finding that Reid's statements were voluntarily made. The fact that Reid ended the interview when Detective Burke raised some questions about Reid's version of events surrounding the homicide demonstrated Reid knew he could end the interview upon his request. The second assignment of error is also overruled.
 {¶ 30} In his third assignment, Reid contends the trial court erred in excusing a prospective juror based on the State's challenge for cause and in refusing to excuse a prospective juror on his challenge for cause.
 {¶ 31} During voir dire examination, the State challenged for cause prospective juror Clowan Vance who indicated in his questionnaire and to the prosecutor that he couldn't judge another person. He indicated he couldn't deliberate because he could not determine whether the defendant was guilty or not guilty. (Tr. 189, 190). During questioning by defense counsel, Vance indicated he couldn't be fair and impartial to either side because he did not want to judge others. (Tr. 282). Then defense counsel pursued further:
 {¶ 32} "MR. O'BRIEN: And you think it would be too much to ask you to do to — to make a determination on whether the evidence — not the person, but whether the evidence satisfies you beyond a reasonable doubt or it didn't satisfy you?
 {¶ 33} "PROSPECTIVE JUROR VANCE: I couldn't hear you.
 {¶ 34} "MR. O'BRIEN: I'm sorry. Let me start all over. I know it might be not pleasing to you. I know you might say, `Boy, I'd rather be in Yugoslavia than be sitting here in this courtroom here.' But that's not the issue. The issue is can you give both sides in this case a fair and impartial trial? Do you think you could do that?
 {¶ 35} "PROSPECTIVE JUROR VANCE: Yeah.
 {¶ 36} "MR. O'BRIEN: Okay. And would you be willing to listen to the evidence in the case?
 {¶ 37} "PROSPECTIVE JUROR VANCE: Yeah.
 {¶ 38} "MR. O'BRIEN: Okay. And would you then be in a position where, if you thought that the evidence did prove — these people are telling the truth here, if you do reach that conclusion, then you can reflect that conclusion by signing a particular form that the evidence was sufficient? Could you do that?
 {¶ 39} "PROSPECTIVE JUROR VANCE: I don't know if I could.
 {¶ 40} "MR. O'BRIEN: Okay. And the reason why you're not sure you could is what?
 {¶ 41} "PROSPECTIVE JUROR VANCE: I feel that — I really could not tell if, you know — I wouldn't want to be put in that position.
 {¶ 42} "MR. O'BRIEN: Okay. You would prefer not to make that determination.
 {¶ 43} "PROSPECTIVE JUROR VANCE: Yeah.
 {¶ 44} "MR. O'BRIEN: Supposing you got put in that position? Could you do it?
 {¶ 45} "PROSPECTIVE JUROR VANCE: I would have to.
 {¶ 46} "MR. O'BRIEN: You would have to. And you could do it.
 {¶ 47} "PROSPECTIVE JUROR VANCE: Yeah.
 {¶ 48} "MR. O'BRIEN: You could do it and be fair to both sides.
 {¶ 49} "PROSPECTIVE JUROR VANCE: Yes, sir.
 {¶ 50} "MR. O'BRIEN: That's all I'm asking."
 {¶ 51} In deciding whether to exclude a juror for cause, the court must determine whether the prospective juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Adamsv. Texas (1980), 448 U.S. 38, 45. R.C. 2945.25 governs challenges for cause, and allows for challenges of those who would favor one side over the other because of enmity or bias, and those who are otherwise unsuitable for any reason to be a juror.
 {¶ 52} R.C. 2313.43 provides that when a juror is challenged on suspicion of being prejudiced or partial to either party, "[t]he validity of such challenge shall be determined by the court and be sustained if the court has any doubt as to the juror's being entirely unbiased." Statev. White, 82 Ohio St.3d 16, 1998-Ohio-363. A trial court has broad discretion in determining a juror's ability to be impartial. State v.Williams (1983), 6 Ohio St.3d 281, 288. Thus, where a prospective juror is being challenged for bias, "[d]eference must be paid to the trial judge who sees and hears the juror." Wainwright v. Witt (1985),469 U.S. 412, 426. A decision on a challenge to a prospective juror regarding his or her fairness and impartiality constitutes reversible error only when the trial court is shown to have abused its discretion. The court's ruling must be manifestly arbitrary and unsupported by substantial testimony. State v. Wilson (1972), 29 Ohio St.2d 203, 211.
 {¶ 53} The State argues that prospective juror Vance had not sufficiently been "rehabilitated" by defense counsel's leading questions. The State argues that Vance only stated he would be able to judge the evidence, but never committed to judging the defendant in arriving at a verdict. Clearly, Vance's commitment to take personal responsibility for signing a verdict form waxed and waned depending on which counsel questioned him. Although we believe this matter close, we cannot say the trial court acted arbitrarily in sustaining the State's challenge to Vance's service as a juror.
 {¶ 54} The appellant also failed to demonstrate that the trial court abused its discretion in overruling the defense challenge to prospective juror Kern's service on the jury. Kern disclosed that his wife worked in the prosecutor's office. He stated several times he believed he could be an impartial juror. (Tr. 183, 194, 255). In overruling the challenge, the court explained, "I take it he's a man of his own ideas and his own ability to stand up for what he thinks his opinion is." (Tr. 255). The court clearly indicated by the remark that it believed Mr. Kern would honor his oath and commitment to decide the guilt or innocence of the defendant without regard to his wife's employment status.
 {¶ 55} The appellant's third assignment of error is overruled.
 {¶ 56} In his last assignment of error appellant contends that the trial court erred in improperly restricting his counsel's cross-examination of certain state witnesses and in the alternative he argues that if counsel did not perform the cross-examination appropriately then he suffered from the ineffective assistance of counsel at the trial. Specifically, appellant contends that his counsel's cross-examination of Robert Essex was hindered when defense counsel was not permitted to impeach Essex with statements that he made to the police shortly after the homicide. Counsel attempted to impeach Essex by asking him about certain police reports which counsel contended contained information different from the testimony that Essex gave on direct examination. The trial court sustained the state's objection on the basis that counsel's using the police report was not a proper way of impeaching the witness. Of course the proper way to impeach the witness would have been to ask Essex if he had not told a specific police officer something different than his trial testimony. Counsel wished to point out that the police notes indicated that Essex had described two of the individuals by what they were wearing without naming them when he spoke to the police but that at trial he actually testified as to the identity of the individuals who were in the house at the time of the homicide. Appellant also contends that he was denied the right to have counsel effectively cross-examine Essex about whether he had told police on the night of the homicide that his brother had told him over the phone that some guys broke into his house window and ran over to Fountain Avenue. Essex denied having made such a statement and defense counsel never did produce a witness who would have said that's what Essex had told the police on the night of the homicide. Appellant also contends that counsel was denied the right to cross-examine state's witness Deadra Adams about her prior testimony that Billy Thomas and the defendant were playing darts earlier in the evening of the homicide. The record reflects that counsel was permitted to confront Deadra Adams with her prior testimony and she acknowledged that Billy Thomas and Tyrone Reid were playing darts earlier in the evening.
 {¶ 57} The appellant's fourth assignment of error is likewise overruled and the judgment of the trial court is Affirmed.
FAIN, P.J., and YOUNG, J., concur.