OPINION
{¶ 1} Defendant-appellant Tyrone E. Reid appeals a decision of the Montgomery County Court of Common Pleas which overruled his motion for leave to file a delayed petition to set aside or vacate judgment and denied his request for an evidentiary hearing on said motion. *Page 2 
The trial court overruled Reid's motions in written decision and entry filed on February 7, 2006. Reid filed a notice of appeal with this Court on March 1, 2006.
 1 {¶ 2} We set forth the history of the case in State v. Reid (November 14, 2003), Montgomery App. No. 19729, 2003-Ohio-6079 (hereinafter"Reid I "), and repeat herein in pertinent part:
 {¶ 3} "On March 25, 2001 Billy Thomas and Cedron Brown were shot to death at 523 Delaware Avenue in the City of Dayton. Dayton police were dispatched around 11:40 p.m. to 524 Delaware Avenue, where residents there directed the officers across the street to 523 Delaware. The residents of 524 Delaware advised officers that someone left the 523 residence and headed northbound on Linda Vista. Officer Dan Mamula observed footprints in the snow heading northbound on Linda Vista that led to the alley behind 523 where Billy lay bleeding from gunshot wounds. Billy told Mamula that he was shot four times, but he did not know who had shot him. Cedron was found dead on a couch in the living room of the Delaware residence.
 {¶ 4} "The residents of 524 Delaware said a possible suspect left the scene in a red Grand Am automobile. Officer David Matthews participated in the apprehension of this vehicle. Matthews removed the passenger from the vehicle, Jabree Yates, who stated to him `a guy had just shot his friend and that he had taken the gun and, in turn, shot him.' A gun was recovered from the front passenger side floorboard, and a baggie of crack cocaine was taken from Jabree's pocket.
 {¶ 5} "The apartment at 523 Delaware was the residence of Deatra Ragland and Damien Adams. Jabree and Cedron were friends of Damien and spent a good *Page 3 
deal of time at Damien's residence. Deatra admitted that these friends of Damien were in the drug trade, and sold drugs out of 523 Delaware.
 {¶ 6} "Damien testified that some guys in a house across the street on Linda Vista sold drugs, with which Jabree and Cedron had a problem with a couple days prior to this incident. He also testified that he told the dispatcher in the 911 call that the guys across the street may be the ones who broke into his house.
 {¶ 7} "Damien and Deatra left Jabree, Cedron, Billy Thomas and Tyrone in the living room when they retired to their bedroom earlier in the evening. Damien and Deatra claimed to be in bed when they suddenly heard a gunshot. The two of them jumped out the bedroom window and ran to a neighbor's house to call 911.
 {¶ 8} "Damien estimates that his brother, Robert Essex, had left his apartment approximately fifteen minutes prior to hearing the gunshot. Essex recalled that he was at the house between 10:30 and 10:45 p.m. that evening, and stayed approximately 15 minutes. Essex testified that he saw four young men with the person he knew was Cedron. Essex claimed to know everyone in the house, except the person he came to know as Billy. The police report indicated Mr. Essex could give little description of anyone in the house, most notably Tyrone whom he did not name.
 {¶ 9} "The key witness for the State was Jabree Yates. Yates testified he was watching television with Cedron, Billy, and Reid in the living room when he fell asleep. He testified he awoke when he heard a gunshot. He testified Reid was pointing a gun away from Cedron and him and then Reid and Billy Thomas rushed him.
 {¶ 10} "Yates testified that the three scuffled and Reid ordered him to `give me that shit' and he removed what money he had from his pockets and threw the money *Page 4 
at Reid. Yates testified that Reid then gave his gun to Billy, said he'd return, and then left the house through the front door. Yates testified he then tried to talk Billy out of the gun he was holding on him. Yates said he struggled with Billy and got it away from him. Yates said Billy told him he had not shot Cedron. Yates said Tyrone started climbing back into the apartment through a bedroom window armed with a shotgun. Yates testified he shot at Reid who disappeared out the window. Yates said he shot at Billy Thomas as he tried to exit the bedroom window. Thomas collapsed in a nearby yard and died from gunshot wounds.
 {¶ 11} "Police recovered a wad of cash on the living room floor where Yates said he threw it and they also recovered Reid's red and black sweater which was hanging on the bedroom window frame and a shotgun just below the window.
 {¶ 12} "Tyrone Reid and Billy Thomas were first cousins, and Reid called Billy's mother to tell her that Billy had been shot. Reid met the family at the hospital. Sgt. Gary White of the Dayton Police Department had arrived, and he testified that Tyrone and his mother agreed to come downtown for an interview. After having been advised of his rights, Tyrone told Det. Doyle Burke that he had dropped Billy Thomas off at 523 Delaware and then had gone on to his girlfriend's house, where he stayed for awhile. Eventually he said he went back to 523 Delaware, walked past the front door to the open window, where he saw Jabree Yates holding a gun. He said Yates fired at him but missed, and he left. He refused to give his girlfriend's name. He said he didn't know her address but he thought he could probably find the house for them, although, he said, that would be futile, since she was not at home."
 {¶ 13} After a jury trial, Reid was ultimately convicted of one count of murder *Page 5 
with a firearm specification and having a weapon under disability. On January 6, 2003, Reid was sentenced to prison terms of fifteen (15) years to life on the murder count, and three (3) years on the firearm specification to be served consecutively to the first count. Reid received six (6) months for the weapons under disability count to be served concurrently with the murder count. We subsequently affirmed Reid's conviction and sentence in Reid I.
 {¶ 14} On August 9, 2005, Reid filed a motion for leave to file a delayed petition to vacate the judgment of the trial court and an accompanying request for an evidentiary hearing. As previously stated, the trial court overruled Reid's motions in a written decision and entry filed on February 7, 2006.
 {¶ 15} The trial court held that Reid's motion for leave was untimely and that he could not satisfy any exception that would justify a late filing. Moreover, the trial court found that the doctrine of res judicata barred Reid's motion because his "new" claims were ones which could have been raised on direct appeal. The trial court denied Reid's request for an evidentiary hearing because the court found that his petition was untimely and the claims raised were barred by res judicata. The court additionally held that a hearing was not required because there were "no material issues to be litigated and no factual basis upon which the petition would be entitled to a hearing." It is from this judgment that Reid now appeals.
 II {¶ 16} Reid's first assignment of error is as follows:
 {¶ 17} "THE TRIAL COURT ERRED IN DENYING THE DEFENDANT'S MOTION FOR LEAVE TO FILE DELAYED PETITION TO SET ASIDE OR VACATE *Page 6 
JUDGMENT ON THE BASIS THAT THE MOTION WAS NOT TIMELY FILED."
 {¶ 18} In his first assignment, Reid argues that the trial court erred when it overruled his motion for leave to file a delayed petition to vacate the judgment against him on the grounds that said motion was untimely. Reid does not dispute that his motion is was not filed in a timely manner pursuant to R.C. § 2953.21(A)(2) which provides in pertinent part:
 {¶ 19} "Except as otherwise provided in section 2953.23 of the Revised Code, a petition under division (A)(1) of this section shall be filed no later than one hundred eighty [180] days after the date on which the trial transcript is filed in the court of appeals in the direct appeal of the judgment of conviction or adjudication or, if the direct appeal involves a sentence of death, the date on which the trial transcript is filed in the supreme court. * * *"
 {¶ 20} As noted by the State, the transcript in Reid's direct appeal was filed on February 25, 2003. Thus, Reid had until August 25, 2003, in which to file his petition for post-conviction relief. Reid filed his petition on August 8, 2005, almost two years outside the date mandated by statute.
 {¶ 21} R.C. § 2953.23 prohibits a trial court from entertaining a late petition unless both of the following provisions apply:
 {¶ 22} "a. either the petitioner shows that he was unavoidably prevented from discovery of the facts upon which the petitioner must rely to present the claim for relief; or subsequent to the period prescribed in [R.C. § 2953.21(A)(2)] or to the filing of an earlier petition, the United States Supreme recognized a new federal or state right that applies retroactively to persons in the petitioner's situation, and the petition asserts a *Page 7 
claim based on that right;" and
 {¶ 23} "b. the petitioner shows by clear and convincing evidence that, but for constitutional error at trial, no reasonable fact finder would have found the petitioner guilty of the offense of which the petitioner was convicted * * *."
 {¶ 24} In support of his motion for leave to file a delayed petition, Reid argues that he was unavoidably prevented from discovering the facts that he needed to present his motion because his appellate attorney refused to turn over his file until February 17, 2005. As the trial court noted, "the evidence in question includes letters, legal memoranda, checks, bills, dockets and maps" which defense counsel possessed at trial, as well as portions of the public record. The trial court held that if Reid had exercised reasonable diligence, he could have learned of the "new" matters contained in the appellate file. Thus, the court concluded that Reid was not unavoidably prevented from discovery of the material.
 {¶ 25} A trial court lacks jurisdiction to hear an untimely filed petition for post-conviction relief if the two conditions of R.C. §2953.23(A)(1) are not satisfied. State v. Melhado (February 14, 2006), Franklin App. No. 05AP-272, 2006-Ohio-641. It should be noted that Reid has made no assertion that the United States Supreme Court has announced any new state or federal right that would apply retroactively to him. Thus, we need only address whether Reid affirmatively demonstrated that he was unavoidably prevented from discovery of the facts upon which he must rely to present a meritorious claim for relief. R.C. §2953.23(A)(1)(a).
 {¶ 26} Reid contends that he was unavoidably prevented from discovering facts upon which he must rely in his petition because he was incarcerated, and therefore, *Page 8 
unable to obtain the record and transcript from his appellate counsel inReid I. Specifically, Reid argues that once he received the file from his appellate counsel, he became aware of prosecutorial misconduct whereby agents of the State allegedly destroyed a tape of a 911 call he made from Geraldine Jones' residence after the shooting. Other than his assertion that he made a 911 call after the shooting and that a taped recording of that call exists, Reid offers no evidence in support of his claim. Additionally, Reid fails to demonstrate how such a recording (if one exists at all) would aid him in his defense. It is worthy of note that the only evidence of a 911 call presented at trial was the call made by Geraldine Jones on the night of the shootings. If such a recording existed, Reid had the ability to discover said recording and the alleged prosecutorial misconduct at the time of trial.
 {¶ 27} Reid also sets forth a number of arguments that his counsel was ineffective at the trial level. First, Reid argues that the record demonstrates that his counsel failed to represent him at a probable cause hearing in juvenile court. Reid also claims that his counsel was not present during all parts of the trial. Reid argues that his counsel was ineffective for failing to call certain eyewitnesses to the shootings that could have provided exculpatory testimony. Reid asserts that his trial counsel did not serve his best interests because counsel did not believe in his innocence. Lastly, Reid argues that counsel was ineffective for failing to consult with him before his counsel made "improper comments to third parties in an attempt to locate a witness." Since he did not receive the file until well after his direct appeal, Reid contends that he was unavoidably prevented from discovering this "new" evidence which supports a claim of ineffective assistance of counsel. *Page 9 
 {¶ 28} All of the claims regarding ineffective assistance of counsel in his petition are based on facts and circumstances that occurred, and were known to Reid, before, during, and immediately after trial. If trial counsel's representation was inadequate, then Reid would have been aware of the deficiency of counsel's performance at the time of trial with or without access to the materials contained in the file.[1]
Moreover, counsel's decisions with respect to whether to call certain witnesses amounts to trial strategy. Reid was present during all phases of his trial, and had knowledge of all of these facts and circumstances surrounding his claims as they happened during the course of the trial. Thus, Reid could have raised all of these arguments on direct appeal or in a timely motion for post-conviction relief. Reid's argument that he was unavoidably prevented from discovering these facts lacks merit.
 {¶ 29} Additionally, Reid fails to demonstrate by clear and convincing evidence that, but for the asserted constitutional violations at trial, no reasonable factfinder would have found him guilty of the offenses for which he was convicted. R.C. § 2953.23(A)(1)(b). In his petition, Reid claims that but for his counsel's ineffective assistance at the trial level, he would have been acquitted of all charges. However, the evidence Reid submits in support of this argument fails to demonstrate that counsel's performance fell below an objective standard of reasonableness. Reid simply cannot satisfy R.C. § 2953.23(A)(1)(a) as discussed above.
 {¶ 30} Thus, we conclude that Reid has failed to demonstrate that he was *Page 10 
unavoidably prevented from the discovery of facts upon which he must rely to present a claim for relief. R.C. § 2953.23(A)(1). Because Reid cannot satisfy the exceptions in R.C. § 2953.23(A), we overrule his first assignment of error to the extent he challenges the trial court's finding that the petition was untimely.
 III {¶ 31} Reid's second and third assignments of error are as follows:
 {¶ 32} "THE TRIAL COURT ERRED IN DENYING THE DEFENDANT'S MOTION FOR LEAVE TO FILE DELAYED PETITION TO SET ASIDE OR VACATE JUDGMENT ON THE BASIS THAT THE CLAIMS RAISED WERE BARRED BY RES JUDICATA."
 {¶ 33} "THE TRIAL COURT ERRED IN DENYING THE DEFENDANT'S REQUEST FOR A HEARING ON HIS MOTION FOR LEAVE TO FILE DELAYED PETITION TO SET ASIDE OR VACATE JUDGMENT ON THE BASIS THAT THERE WERE NO FACTUAL ISSUES TO BE LITIGATED AND NO FACTUAL BASIS ON WHICH DEFENDANT WOULD BE ENTITLED TO A HEARING."
 {¶ 34} In light of our ruling with respect to Reid's first assignment of error, it is unnecessary for us to reach the merits of assignments of error two and three. Said assignments are, therefore, rendered moot. IV
 {¶ 35} Although he is represented by counsel in the instant appeal, Reid filed a pro se brief in which he mistakenly argues that his appellate counsel's brief only addressed one of the two cases implicated in this appeal. A thorough review of the record in this matter reveals that Reid's appellate counsel properly addressed both *Page 11 
case numbers CA-21499 as well as CA-21573 in the brief filed on Reid's behalf. Contrary to Reid's assertions, he is not entitled to depose witnesses at the appellate level.
 V {¶ 36} All of Reid's assignments of error having been overruled or rendered moot, the judgment of the trial court is affirmed.
FAIN, J. and GRADY, J., concur.
[1] n point of fact, Reid did argue on direct appeal that certain of counsel's actions concerning cross-examination of witnesses amounted to ineffective assistance. *Page 1