[Cite as *State v. Hill*, 2019-Ohio-3921.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 28110 |
| | : | |
| v. | : | Trial Court Case No. 2017-CR-459 |
| | : | |
| SHAUN D. HILL | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 27th day of September, 2019.

. . . . . . . . . .

MATHIAS H. HECK, JR., by HEATHER N. JANS, Atty. Reg. No. 0084470, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45422
  Attorney for Plaintiff-Appellee

LUCAS W. WILDER, Atty. Reg. No. 0074057, P.O. Box 574, Dayton, Ohio 45409
  Attorney for Defendant-Appellant

. . . . . . . . . . . .

DONOVAN, J.

{¶ 1} Shaun D. Hill appeals from a judgment entry of conviction on one count of felonious assault, in violation of R.C. 2903.11(A), a felony of the second degree (Count I), with a three-year firearm specification, and one count of having weapons while under disability (prior drug conviction), in violation of R.C. 2923.13(A)(3), a felony of third degree (Count III). The court merged a second count of felonious assault with Count I. The court sentenced Hill to eight years on Count I and 36 months on Count III, to be served consecutively, and imposed an additional consecutive three-year term for the firearm specification. We hereby affirm the judgment of the trial court.

{¶ 2} On March 2, 2017, Hill was indicted on two counts of felonious assault and one count of having weapons while under disability. The charges arose from a shooting outside the Liquid Sports Club ("the Club") in Harrison Township. Hill pled not guilty on March 7, 2017. On April 5, 2017, he filed a motion to suppress a photospread used to identify him. A hearing was held on the motion on September 9, 2017. At that time, defense counsel made an oral motion to also suppress Hill's statements.

{¶ 3} Detective Brian Shiverdecker of the Montgomery County Sheriff's Office ("MCSO") testified that at approximately 2:15 a.m. on February 11, 2017, he responded to the Club on a report of a shooting with one victim. Shiverdecker stated that club staff advised him that "they had a video of the individual that was in the parking lot shooting. * * *. They said they had video of him entering the club, and they also had video of the actual shooting itself." Shiverdecker watched the video and, because Shiverdecker was familiar with the shooter and some of his extended family, Shiverdecker identified Hill. Shiverdecker testified that, after viewing the video, photospreads were created by means

of JusticeWeb.[1]

{¶ 4} Detective Walt Steele of the MCSO testified that he responded to the Club on the date of the shooting shortly after 3:00 a.m. When he arrived, Shiverdecker was already inside reviewing video recordings with management. Shiverdecker said he had already developed a suspect, Shaun Hill. Steele looked at the video and "confirmed that that was Shaun Hill in the video." Steele stated that he was familiar with Hill, who had been involved in an officer-involved shooting on January 26, 2017, at the Hawthorn Suites in Miami Township; Steele had interviewed Hill face-to-face at that time, and Hill "was on cruiser video during that incident also." Steele testified that he was aware that Hill was out on bond from the Hawthorn Suites shooting when he viewed the video at the Club. Steele obtained a warrant for Hill's arrest on February 14, 2017. Hill was taken into custody on that warrant at his arraignment on the Hawthorn Suites shooting on February 21, 2017.

{¶ 5} At the time of Hill's arrest, Det. Steele had not yet interviewed him about the shooting at the Club. Upon learning of Hill's arrest, Steele proceeded as follows:

> * * * So I got Detective Shiverdecker and we were relocated to the County Jail. Shaun Hill was still in the booking area, he hadn't been booked in, on the initial set of chairs. Walked up to him, and I said, "Shaun, put your hands behind your back. We're going to escort you over to our special investigation's section to interview you reference to the shooting."

{¶ 6} According to Det. Steele, Hill commented that he had an attorney and

---

[1] We note that the photospreads are not at issue in this appeal, and although we have reviewed all the testimony, we will not include the testimony regarding the creation and administration of the photospreads herein.

requested that his attorney be present. Steele testified that he removed Hill's handcuffs and allowed him to make a phone call from the jail. According to Steele, Hill advised him that he had "contacted his people" and that his attorney would be meeting him over at the sheriff's office to watch this video and possibly to make a statement. Steele stated that he took Hill "right across the street" from the jail to the sheriff's office. Steele testified that, in the course of the walk, he did not ask Hill any questions and did not advise him of his rights. Steele testified that when Hill's attorney arrived, the attorney and Hill spoke privately in an interview room, and their conversation was not recorded. Steele could not recall the attorney's name, but he believed the attorney was an assistant to attorney Kevin Lennen.

{¶ 7} Steele testified that he then received a phone call from Kevin Lennen, who "said that he wasn't coming over, his client wasn't going to be watching any video or making any statements." Steele testified that when Hill and the attorney who was present were finished speaking, he placed Hill back in handcuffs, and he and Shiverdecker returned him to the jail. He stated that he did not ask Hill any questions on the way back to the jail. When asked if Hill made any statements on the way back to the jail, Steele testified that Hill said, "I was at the club; however, I wasn't involved in any fight and I wasn't involved in any shooting." Steele stated that he did not ask any follow-up questions because Hill had requested an attorney. Steele stated that he documented Hill's statement in his police report. He stated that Hill did not appear to be under the influence or overly tired when he made the statement.

{¶ 8} Det. Steele identified State's Exhibit 9 as a JusticeWeb printout of Hill in Case No. 2017CRA203 in Miamisburg Municipal Court in connection with the Hawthorn Suites

shooting, reflecting that Hill was booked into jail in that case on January 26, 2017, the day that Steele interacted with him. Steele stated that it further reflected that Hill "bonded out" on January 28, 2017.   Steele identified State's Exhibit 10 as another JusticeWeb printout involving Hill in Montgomery C.P. No. 2017CR459, the shooting at the Club, reflecting that Hill was booked into jail on February 21, 2017.    Steele identified State's Exhibit 7 as the docket printout from the PRO system for Case No. 2017CR459, and he testified that on February 16, 2017, Jon Paul Rion filed a notice of appearance, although the indictment was not issued until March 2, 2017.   Steele identified State's Exhibit 8 as another docket printout, for Montgomery C.P. No. 2017CR312, in which Hill was indicted on February 6, 2017 and Jon Rion entered a notice of appearance on February 15, 2017.

{¶ 9} On cross-examination, Steele testified that he was aware that "a defense attorney" had viewed the video from the Club before February 21, 2017.   Steele stated that he was aware that Hill was represented by counsel in the Hawthorn Suites shooting, but he "didn't know you could file a notice of being an attorne[y] before they're charged." The following exchange occurred:

[DEFENSE COUNSEL] Q.   * * * And when Mr. Hill appeared in court, he was then taken over - - on the 21st he was taken over to the jail, correct?

A.  Yes.

Q.  And he was booked into the jail?

A.  He was.

Q.  And so your involvement in the case had nothing to do with the booking-in process that had been completed, right?

A.   That's right.

Q.   And Sergeant Hutchison had informed you that a lawyer had been involved in speaking with them in reference to Mr. Hill's case, correct?

A.   That's correct.

Q.   And nonetheless did you bother to look to see if he was represented by counsel?

A.   I did not.

Q.   Did you - - you didn't check any of your computer databases?

A.   Well - -

Q.   To determine whether or not he was represented by counsel.

A.   I believe I knew he was represented [by] counsel on the Hawthorn Suites, officer-involved shooting.

* * *

Q.   And you didn't bother to check to see if that counsel represented him on this case.

A.   * * * I didn't think you could file a notice of being an attorne[y] before they're charged.

* * *

Q.   But you knew that a lawyer had actually gone over to speak with officers about this case. * * *

A.   Yeah.

Q.   So then you went over to the jail you actually removed him from the jail.   Did you have a warrant to remove him?

A. No.

Q. Did you have any authority from a court to remove him?

A. No.

* * *

Q. So you took him out of the county jail and walked him across the street to your office.

* * *

A. * * * And * * * at that point he already told me that he - - he invoked that he wanted an attorney before that, before I even took him out of the jail.

* * *

Q. But you took him out of the jail anyway.

A. Upon an agreement with him, yes.

* * *

Q. You of your own volition went over to the jail without checking to see if he had counsel to remove him from the jail, correct?

A. Yes.

* * *

Q. And while he's still sitting down in post-book, he requested an attorney.

A. Yes.

Q. And you didn't just leave.

A. * * * I said, "Shaun Hill, I'm going to take you across the street

to talk to you about this shooting."   He says, "I have an attorney; however, I want to see the video with my attorney," and I was like, "Okay."

* * *

THE WITNESS:   I said, "Okay.   To do that you have to contact your attorney and he can meet us over there."   He said, "Okay."   I said, "I'll take you to the phones, call your attorney, and see if he'll meet us over there, if you want to do that."

THE COURT:   Now, where are the phones?

THE WITNESS:   The phones are right there. The post-book section is [a] set of chairs. * * * [I]t's in the fingerprint section, it's an open area, ten feet from where he's sitting.

THE COURT:   Did you take him to the phones?

THE WITNESS:   I walked him to the phone.

THE COURT:   Did he use the phone?

THE WITNESS:   * * * I handed him the phone, and I said, "Dial the number that you need," and to do that.   He did that.   He talked on the phone to someone.   I believe it was his people that he talked to on the phone.   He got done with the conversation and he says, "Okay.   I'm going to have my attorney meet us over there."   So I said, "Okay."

Placed handcuffs on him.   We walked him across the street, walking - -

THE COURT:   And then the rest happened with the attorney, then with Kevin Lenn[e]n's phone call?

THE WITNESS: Exactly.

THE COURT: Okay. Okay.

BY MR. RION:

Q. Did you mention anything about a video in post-book?

A. I didn't.

Q. Was there any reason for you to go over and speak to him in post-book other than for investigative purposes?

A. I was just going over to tell him that I'm taking him across the street for an interview.

Q. So * * * there's no other reason to go speak to him except for investigative purposes, correct?

A. That's correct.

{¶ 10} Sergeant Melvin Hutchison of the MCSO testified that he responded to the shooting at the Club. Hutchison testified that he reviewed the video of the shooting from the Club with attorney Jon Paul Rion, before Hill was taken into custody.

{¶ 11} At the conclusion of the hearing, the court indicated that it would be continued until September 27, 2017, for the testimony of Deputy James Flora,[2] who was unavailable.

{¶ 12} On October 27, 2017, the court overruled Hill's motion to suppress. Regarding Hill's statements, the court specifically found Det. Steele's testimony credible and found that, if Steele had initiated any questioning of Hill on February 21, 2017, those

---

[2] We note that the testimony of Deputy Flora is not included in the record before us, and that defense counsel did not request it in his praecipe.

statements would have been suppressed. The court found that the evidence, however, demonstrated that no questioning took place; rather, Hill "made statements spontaneously and with[out] provocation from law enforcement. The court determined that the statements Hill made on February 21, 2017 were "not subject to suppression."

{¶ 13} On February 14, 2018, the State filed a motion in limine to prevent Hill from mentioning or eliciting "exculpatory and self-serving statements of [Hill] in opening statements or through either the direct or cross-examination of third-party witnesses," because such statements by Hill would be hearsay and inadmissible under Evid.R. 802. On March 2, 2018, the State filed a second motion in limine to prevent Hill from mentioning or seeking to introduce any testimony or evidence of "any alleged uncharged acts of the victim, allegedly occurring subsequent to the incident in the indictment in this case," which, even if true, were unrelated to the incident in the indictment. On the same day, Hill filed a motion for psychological evaluations regarding his competency to stand trial and his sanity at the time of the offenses. The court ordered such examinations and, on April 19, 2018, the court found Hill competent to stand trial.

{¶ 14} On May 9, 2018, Hill filed a motion in limine in which he requested that the court exclude from evidence at trial the following items, on the basis that they were irrelevant, "more prejudicial than probative," and would prevent him from receiving a fair trial on the merits: an edited videotape purporting to show events from the shooting at Liquid Sports Club on February 11, 2017; any and all testimony from Det. Shiverdecker purporting to identify Hill from said videotape; and any and all testimony from various security guards employed by Liquid Sports Club also purporting to identify Hill from the videotape in question. Hill also filed a motion to sever the weapon under disability count

for trial or, in the alternative, to stipulate to his prior record. On the same day, Hill filed two motions to withdraw his motions in limine.

{¶ 15} Trial was held on August 13-16, 2018. The evidence presented at trial was as follows:

{¶ 16} Deputy Craig Stone of the MCSO, an evidence technician, testified that on February 11, 2017, he responded to the Club on "a shots fired call" at around 1:30 a.m. He testified that he was the first responder to arrive and that he observed a large crowd in front of the Club and "[s]creaming, people running, a pretty chaotic scene." After making his way through the crowd, Stone observed a man on the ground on his right side in front of the front door with "several females laying on top of him, screaming, and blood on the ground." He said the man was non-responsive and was placed into an ambulance within a few minutes. Stone stated that three security officers from the Club filled out statements after being separated into cruisers. On cross-examination, Stone stated that he spoke to Drewmar Threats, a security guard, at the scene.

{¶ 17} Jacob Miller, a firefighter and paramedic for Harrison Township, testified that on February 11, 2017, he responded to the Club on the report of a gunshot wound and arrived within five minutes of the dispatch. Miller testified that the victim "was found in the fetal position, laying towards the front door with a pool of blood surrounding him." Miller stated that the victim was in "hypovolemic shock," which meant he was losing more fluids than he was producing. The victim had four penetrating injuries, and his clothing was removed from him at the scene by the medics. Miller stated that the victim's condition was "deteriorating" and that he was transported to Miami Valley Hospital ("MVH"). Miller testified that, after the victim's blood pressure was stabilized while in

route, he began to speak, and Miller learned that his name was Kenneth Freeman. Miller testified that after Freeman's care was transferred to MVH, he cleaned his vehicle for the next run, and he discovered a bullet in the back of the vehicle. He testified that he alerted Deputy Rob Brown of the MCSO, who had followed the ambulance to MVH. Miller testified that he did not touch the bullet and that he learned that Brown collected it from the vehicle.

{¶ 18} Kevin Ingersoll testified that in February 2017, he had been the manager of the Club for a year. He stated that the Club had indoor and outdoor video security cameras at the time of the shooting. Ingersoll testified that on February 11, 2017, there "was a scuffle inside, and there was a shooting that evening outside of our business." Ingersoll stated that he was in the kitchen during the incident and did not observe it, but he viewed the video footage and provided it to law enforcement. Ingersoll identified State's Exhibit 22 as a recording of the incident which contained individual videos from the cameras throughout the Club. Exhibit 22 was played for the jury without objection. While viewing the video, Ingersoll identified "Drew" and "Marcellus" as security guards at the front door patting people down and collecting cover charges. Ingersoll identified State's Exhibits 22A - K as still frames from the video.

{¶ 19} Deputy Rodney Brown of the MCSO testified that he was dispatched to the Club on February 11, 2017. Brown stated that his sergeant advised him to follow the ambulance to MVH to provide updates on Freeman's condition. He stated that, after speaking with Miller, he proceeded to the ambulance and observed "a bullet fragment. Normally the projectile is made of lead and then encased in a brass jacket, and it appeared to be the piece of the lead and then the piece of the brass from the projectile."

Brown testified that he did not have a camera in his cruiser, and after speaking with his supervisor, the decision was made that "I would collect and place them in a slide box and into an envelope, keep custody of them until I responded back to the [C]lub, and I would present it to the evidence technician." Brown testified that after he left MVH he gave the items to Detective Egloff.

{¶ 20} We note that, in the second day of trial, Hill filed an amended motion in limine to exclude in part any testimony from Steele identifying him (Hill) from the video, citing *State v. Coots*, 2015-Ohio-126, 27 N.E.3d 47 (2d Dist.). Hill asserted that the court in *Coots* "made clear that calling a witness whose familiarity with a defendant was based on the defendant's past criminal conduct could impermissibly deprive a defendant of the right to cross examination." Hill also filed an amended motion to sever the count of having weapons under disability or, in the alternative, to stipulate to his prior record.

{¶ 21} When trial resumed, Detective Ben Egloff of the MCSO testified that he responded to the Club on February 11, 2017 to collect and preserve evidence. Egloff testified that he took photos of the scene and marked pieces of evidence with numbered placards. Egloff testified that he employed a system called "TruAngle," which is a laser measuring device to map a scene and produce a diagram and a legend thereof. Egloff identified State's Exhibits 1-19 as photos taken by him at the scene and State's Exhibits 24 and 24A as the diagram he completed at the scene and a corresponding placard list indicating what each of the placards represented. Egloff identified six .9 millimeter shell casings, Freeman's identification, a set of keys, and Freeman's bloody clothing from the scene. He testified that the key fob on the set of keys "was actually kind of broken off and to the side," and "part of the copper part of a bullet" was lodged within that key fob.

Egloff testified that he also found two unfired .22 caliber rounds and retrieved a weapon from security guard Andre Carter capable of firing .22 caliber rounds. He identified a bloody red jacket from the scene and "a bullet from the red jacket" that fell out of the fabric. Egloff testified that Deputy Rod Brown also brought him a bullet and bullet fragments, which he identified.

{¶ 22} Walter Bender of the MCSO Forensic Service Unit testified that, on February 13, 2017, he responded to MVH to collect a bullet fragment.

{¶ 23} Outside the presence of the jury, the prosecutor stated that the parties had agreed to the following stipulation: "On September 29th, 2010, the defendant was convicted of a felony offense involving the illegal possession, use, sale, administration, distribution or trafficking in any drug of abuse in State v. Shaun D. Hill, Montgomery County Common Pleas Court Case Number 2009-CR-3326." The court acknowledged that a stipulation "was asked for in accordance with the *Creech* case,"[3] and that defense counsel wanted to put something additional on the record. Defense counsel then stated:

> [DEFENSE COUNSEL]: * * * For the record, our initial request was
>
> for a severance of the weapons under disability count from this trial

---

[3] In *State v. Creech*, 150 Ohio St.3d 540, 2016-Ohio-8440, 84 N.E.3d 981, ¶ 41, the Ohio Supreme Court held that, "[p]ursuant to Evid.R. 403, in a case alleging a violation of R.C. 2923.13 [having weapons while under disability], when the name or nature of a prior conviction or indictment raises the risk of a jury verdict influenced by improper considerations, a trial court abuses its discretion when it refuses a defendant's offer to stipulate to the fact of the prior conviction or indictment and instead admits into evidence the full record of the prior judgment or indictment when the sole purpose of the evidence is to prove the element of the defendant's prior conviction or indictment." Upon remand, the court instructed the trial court to "accept Creech's stipulations as to each count either that he has been convicted of a felony offense of violence or that he has been convicted or indicted for a felony offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse." *Id. at* ¶ 41*.*

altogether.

Our first alternative was that if not be severed [sic] that we be permitted to stipulate to the element of weapons under disability with regard to his prior record and that the jury then not hear any evidence with regard to the charge or anything else during the trial as far as him having a prior record, at all, unless or until he chose to testify. And our request for that is based upon - - let me just put on the record and I've already brought it up in chambers and provided the case law. But our request is based upon the Second District case, *State v. Riley*, 98 Ohio Appellate 3d 801, and Judge Donovan's concurring opinion in *State v. Wood* (sic) here in [the] Second District, which is 2018 Ohio 875, where [in] her concurring opinion she decided [sic] to *Riley* and indicated it was still, in her belief, still the law of this Circuit [sic] and that is that it is permissible for somebody in Mr. Hill's position to stipulate to that prior conviction element and for the prior conviction part then to be sanitized from trial.

So we are respecting Your Honor's ruling in chambers on this issue but we're just placing that of record.

With that being said then our second alternative, * * * is to agree to the stipulation as the State has set forth.

* * *

[PROSECUTOR]: * * * Once we were made aware that the defendant did not wish to waive the jury on the weapons under disability charge - - which he doesn't have to waive it. * * * [T]he State proposed a stipulation

which included the actual name of the crime, as well.

And then we have both agreed, in line with *Creech*, to the stipulation that I've read, it removes that name, but it tracks the language because we have to prove what kind of disability. * * * And we have to prove that element.

So we have the tracking of the language for the drug of abuse disability.

THE COURT: * * * As far as severing the two charges, they are (indiscernible) related as alleged in this case that the defendant is charged with shooting Mr. Freemen with a gun while he has a disability. So there is no reason to separate those into two separate trials. * * *

Number two, the defendant was given the option to waive the jury on the weapons under disability, * * * and he chose not to.

Having not done that then following the language of *Creech*, defense counsel then asked for a stipulation as to what that prior offense was and I believe the language of the stipulation that both parties have agreed to, although it was neither their first choices, tracks *Creech*, I believe that you can waive a jury on a count but I do not believe case law from the Supreme Court is such that * * * a defendant is allowed to waive a jury on an element. A charge is based on elements. We all know that. All the elements make up the charge. The State has to prove them all. And I'm not inclined to believe that you can waive one and not the rest. So that's the ruling on that.

{¶ 24} The court then addressed defense counsel's request regarding Steele's

identification of Hill on the video in the course of the following exchange:

THE COURT: * * * [T]he detective can testify that he identified him from the video - - though you can cross on that - - from an interaction two weeks before but no indication that was that shoot-out case that we've already dealt with in two other cases and it's still pending here.

So Detective, you can testify that you recognize him on the video, that it was from an interaction two weeks before but unless you're cross examined on the time, length, et cetera of the interaction and you would need to explain it, you cannot go into the facts of that.

So if you open the door, you open the door. If not, that's all he's going to say. Okay?

[PROSECUTOR]: And to be clear. Was Detective Steele mentioned in that motion in limine? I thought that was only with respect to Detective Shiverdecker.

* * *

[DEFENSE COUNSEL]: Yes. But then after the motion had been filed the State indicated they weren't going to have Detective Shiverdecker testify so - -

THE COURT: Are you amending it now?

[DEFENSE COUNSEL]: I'm amending it now.

THE COURT: Fine. And based upon the amendment, I made my ruling.

{¶ 25} The victim, Kenneth Freeman, testified he had a prior 2012 conviction for

conspiracy to possess with intent to distribute heroin and a 2010 conviction for possession of heroin. He stated that when he walked out the door of the Club alone on February 11, 2017, he was shot, and that he did not see who shot him. He stated that he was treated at MVH in the intensive care unit until May, and then he was treated at Kindred Hospital, a rehabilitation facility, until the end of June. When asked about any long-term complications from his injuries, Freeman replied, "Rods, stent in my artery, nerve damage in my left leg"; the stent was in his pelvis. He had several surgeries, the last of which was in December 2017 for an ileostomy bag requiring a month-long hospitalization. He stated that he was still on a prescription fentanyl patch, that he took a blood thinner after developing blood clots since the shooting, and that his doctors have told him he will be on medication "[f]orever." When asked what part of his body hurts him, Freeman responded, "My bottom to my top, my stomach." He testified that his pain is constant, and that he was not in pain prior to the shooting. Freeman showed the jury the scar on his abdomen from his surgeries, and he stated, "I got to have mesh in my stomach." Freeman testified that he did not have a gun while at the Club.

{¶ 26} Marcellus Haynes testified that he was employed at the Club in February 2017 as an assistant manager and head of security. Haynes acknowledged that he was convicted of involuntary manslaughter in 2000. He testified that he was working at the main entrance collecting cover charges on the date of the shooting. He stated that customers were initially patted down and checked for weapons by another security guard before reaching him. Haynes testified that another guard called him from the back of the Club "saying we had a fight going on. I left the front door, went towards the back and as I got there one of my other guards had somebody laying, they were on the ground. I

tripped over them. I got back up and escorted the gentleman who was kind of trying to egg the situation on and escorted him out of the building." Haynes testified that the person he escorted out was wearing a shirt with a unique design that "took up pretty much all of his chest." He stated that he initially encountered the individual at the front door, and that his mannerisms "were kind of effeminate when he walked in." Haynes identified Hill in court over objection as the person he escorted from the Club.

{¶ 27} Haynes testified that he returned to the back of the Club "to finish breaking it up," then got "a yell from up front" that there was a disturbance at the main entrance. He stated that when he got to the front door, the security workers were not letting anybody else in "because he [Hill] was standing out there, all of a sudden probably two minutes later, gunshots rang out." Haynes testified that he "jumped over the counter, hit the emergency button for the sheriff's department and called 911." Haynes testified that he then went outside and observed "a gentleman laying at the front of our establishment on the ground and there was blood." Haynes testified that he viewed the video footage, and the camera pointing at the front door captured "the defendant, his shirt, when he was running up, when he shot the young man outside."

{¶ 28} The following exchange occurred:

[PROSECUTOR] Q. Mr. Haynes, is there any doubt in your mind that the defendant in this courtroom is the same person you saw come into that bar with that design on his shirt?

A. No.

Q. Is there any doubt in your mind that the person you escorted out of the bar is this defendant?

A.   No.

Q.   Is there any doubt in your mind that the person who shot the victim is this defendant?

A.   No.

{¶ 29} On cross-examination, Haynes stated that he and Hill "looked at each other so I saw his face, he saw my face so I knew his face."   Haynes acknowledged that, due to the angle of the camera, the shooter's face was not visible on the video at the time of the shooting.   He also stated that he did not have good vision in one of his eyes.   On redirect examination, Haynes stated that Hill was not a regular customer and that he accordingly paid more attention to him, because "[o]ur new people, we just want to make sure that when they're coming in they're not going to cause an issue or trouble."

{¶ 30} The following exchange occurred on recross-examination:

Q.   So your testimony today sounds like you're saying that the person in court is who you think fired the shot; is that what I'm picking up here?

A.   I never said that.

Q.   * * * So you can't be sure of that, can you?

A.   No.

Q.   You have no idea about that.

A.   No, I wasn't outside when the shots happened.

* * *

Q.   You looking at the video afterwards and trying to figure out who the person that fired the shots was, that would just be your opinion, wouldn't

it?

A. Based on the clothing he had on, yes.

**{¶ 31}** Dr. Gregory Semon, a trauma surgeon at MVH, testified that he became involved in Freeman's care a few days after his injury. Semon stated that Freeman's medical records for his care at MVH are over 7,000 pages in length. He stated that Freeman arrived at MVH as a "Category 1 Trauma Alert," which means that he had "potential life-threatening injuries and severe alteration of [his] vital signs." Specifically, Semon stated that Freeman suffered from "an altered mental status and a low blood pressure." According to Semon, for a patient with multiple gunshot wounds, "a low blood pressure automatically means that the patient is bleeding to death." He stated that upon Freeman's arrival, Semon's partner, Dr. Katherine Churz, took Freeman "emergently to the operating room for expiration [sic] of his abdomen." Semon stated that the immediate goal was to stop the bleeding and control contamination. He stated that Freeman was in "Category 4" for shock, meaning that he had lost more than 40 percent of his blood.

**{¶ 32}** Semon stated that Freeman's initial surgery was successful and was "what's called a damage control surgery," which was performed "with a plan to return to the operating room within 24 to 48 hours to reassess for any other injuries that were missed at the initial surgery and complete the repairs that may have been started at the initial surgery." Semon testified that Freeman had an injury to one of his iliac arteries that required repair, and with "an injury to the iliac artery, a patient could potentially lose their leg if that's not recognized." Semon testified that Freeman's injury "required multiple surgeries related to the iliac artery. He testified that Freeman also had an "an injury to the vein from the bullet. And anytime there's an injury to the vein, it requires

repair * * * [and] it leads to blood clots which he eventually did develop." Semon stated that a blood clot can lead to a pulmonary embolism, which can be fatal because it prevents oxygen and blood from getting to the lungs." Semon stated that Freeman was prescribed blood thinners, and that blood clotting is a continual and ongoing problem.

{¶ 33} Semon stated that Freeman sustained injuries to the colon and small bowel that "required resections and to be put back together." Due to the severity of the injury to the colon, doctors performed a colostomy, which Freemen had for several months before it was reversed. Semon testified that Freeman developed a gastrointestinal bleed in the area of the colostomy, "so there was blood coming out of the colostomy." He stated that he performed surgery to stop the bleeding, and that Freeman "required subsequent returns to the operating room after that surgery." Semon testified that Freeman had hemorrhaging from his rectum from a bullet wound, which is a difficult area to repair, "but fortunately they often heal themselves. That's why we divert the stool away from the rectum with the colostomy." Semon stated that one of the bullets fractured Freeman's femur, which required repair by an orthopedic surgeon, specifically "a nail placed through the femur."

{¶ 34} Semon further testified that Freeman stayed in the Medical Surgical Intensive Care Unit at MVH, which involves one nurse for every two patients and "a very intense level of care." He stated that the unit is reserved for the sickest patients in the hospital. Semon testified that Freeman was prescribed opioid pain medication and that 70% of patients with his type of injuries will remain on lifelong pain medication.

{¶ 35} Semon testified that Freeman was discharged from MVH on March 27, 2017, to Kindred Hospital, "a nursing home-type facility for advanced care" to address his

"significant needs." Semon testified that Freeman had experienced a significant weight loss for numerous reasons, "the biggest of which [was] the stress of the amount of surgeries he underwent and the stress of the initial injury'; it required more calories for those types of injuries to heal. Semon testified that Freeman lost part of his intestines, which absorb nutrients, and as a result he "will have a nutritional deficit for the rest of his life." He stated that, in total, Freeman had 19 surgeries. When asked how long he remained in intensive care, Semon stated that it was several weeks, and that Freeman also required multiple "returns to intensive care" due to complications.

{¶ 36} Semon stated that, after Freeman was discharged to Kindred Hospital, he returned to MVH multiple times, including for the eventual reversal of the colostomy. Following that surgery, he developed an "infectious complication" requiring another procedure for drainage. Semon testified that doctors often reinforce patients' abdominal walls with mesh to aid in the healing of a defect there, which in Freeman's case was "the opening required in his abdomen to perform his surgeries."

{¶ 37} Drewmar Threats testified that he worked security at the Club in February 2017, mainly "[w]anding, patting down, checking purses." He stated that on February 11, 2017, he walked through the Club, "looking for any issues or problems." He stated that the security personnel have walkie-talkies with earpieces to communicate; Threats did not have a gun, but fellow employee Andre Carter did. On the night of the shooting, Threats heard loud arguing in the back of the Club and approached the area to try to diffuse the situation. He stated that he initially observed two women arguing, but then men "started jumping in" to "start a big fight" among six or seven people. Threats testified that security personnel tried to push the combatants out the side door of the Club.

{¶ 38} Threats testified that Andre Carter communicated with him, and that he then proceeded to the front door of the Club. The following exchange occurred:

[PROSECUTOR] Q.   What do you see or hear happen next?

A.   I see one guy come up and brandish a weapon which Andre pulls down, pulls his weapon out on him.   He shot twice into the ground and ran off.

Q. * * * You say Andre drew, what does that mean?

A.   He drew his weapon, his pistol.

Q.   Did you see Andre Carter ever fire his weapon?

A.   Yes.

* * *

A.   I think he had one shot off and then it jammed.

Q.   * * * Now you talked about this shooter who shot into the ground. Can you tell me, where did that happen?

A.   It happened by our big sign in the front. * * *

Q. * * * So it was further away from the front - -

A.   Yes.

Q.   - - entrance? * * * After you see this first guy shoot twice.   You say he shot into the ground?

A.   Yes.

Q.   What happens next?

A.   He runs off.   Then the next thing I know see [sic] a guy, * * * walking up and brandishing another weapon which, at that point * * * he lets

off two to three more shots at a guy that was standing right in front of the door, entrance.

\* \* \*

Q. \* \* \* How close were you to this?

A. Five to ten - - five to maybe ten feet behind the guy.

Q. And were you able to see the guy who had brandished that gun?

A. Yes.

Q. Do you see him in the courtroom today?

A. Yes.

\* \* \*

[PROSECUTOR]: \* \* \* I ask the record reflect that Mr. Threats has identified the defendant.

THE COURT: So noted.

Q. What happened when the defendant shot that man who was standing there? What happened to the guy who got shot?

A. He drops to the ground. At first, he didn't drop. He grabs his stomach abdomen area and was kind of, \* \* \* on his way down, you know, this other guy - - the guy that did the shooting, he was running off and shot backwards two more shots.

\* \* \*

Q. Have you ever seen the video from February 11th, 2017?

A. No.

\* \* \*

Q. What are you basing your ID on?

A. My own two eyes.

{¶ 39} On cross-examination, Threats acknowledged that when he identified Hill in a photo spread, he said he "was 80 percent sure."

{¶ 40} Shane Stumbo testified that, on February 12, 2017, he was employed as an installer at the Phoenix Group, which is a subcontractor of Spectrum. He testified that on that day while up on a utility pole in an alley near Brookline Avenue, he observed a gun lying on the ground. Stumbo stated that the weapon was a semiautomatic, and that the magazine was missing. He called the Dayton Police. Stumbo testified that a responding officer picked up the weapon "and pulled the thing back and a bullet fell out" of the chamber. Stumbo identified a photograph of the weapon taken by him.

{¶ 41} Paul Harris of the Dayton Police Department testified that he was dispatched to the area of Brookline Avenue on February 12, 2017, and that he made contact with Stumbo there. He testified that he collected the gun Stumbo discovered, which he identified as State's Exhibit 36. He testified that he ejected one round from the chamber. Harris testified that the weapon was a Smith and Wesson .9 millimeter, and that he tagged it in the property room.

{¶ 42} After Harris's testimony, the prosecutor read the above stipulation to the jury. The court explained to the jury that the stipulation related to one of the elements of having a weapon while under disability, a prior conviction. "Obviously, there are other elements, too. The fact that that is a stipulation is not to be used for any other purpose in this trial except as to that one element of that one charge."[4]

---

[4] Prior to deliberations, the court further instructed the jury that the stipulation "was

**{¶ 43}** Mary Cicco, a forensic scientist in the serology and DNA section at the Miami Valley Regional Crime Laboratory ("MVRCL"), was designated as an expert in forensic science specializing in serology and DNA. Cicco testified that she swabbed State's Exhibit 36, the gun, for touch DNA on the grip, the slide, and the trigger. She testified that, before she analyzed the gun, it had been submitted to the firearm section of the MVRCL. She stated that she expressed concern to Det. Steele because she knew the people working in the firearm section did not wear gloves; her concern was that she "would pick up DNA from each and every one of the analysts that had also touched the item." Cicco testified that she was provided with Hill's DNA standard. In testing the weapon, she "obtained a partial mixed DNA profile," but she made no determination with regard to Hill being a contributor. She could not exclude him, which meant she was "looking at this mixed profile of a couple of individuals. I see possible DNA types that may have come from him; however, I cannot state that definitively."

**{¶ 44}** Chris Monturo of the MVRCL, a forensic firearm and toolmark examiner, was designated as an expert in those areas. He testified that he examined and test-fired State's Exhibit 36. Monturo testified that he also examined State's Exhibit 33, the bullet from MVH; State's Exhibit 34, the bullet fragments from Miller's ambulance; State's Exhibit 35, additional bullet fragments; State's Exhibit 26, the bullet retrieved from Freeman's red jacket; and State's Exhibit 27, the bullet jacket in the key fob. He testified that State's Exhibits 26, 27, and 33 were fired from State's Exhibit 36. Monturo testified that he also examined six shell casings in State's Exhibit 25. He testified that four of

received because a prior conviction is an element of the offense charged. It was not received and you may not consider it to prove the character of the defendant in order to show that he acted in accordance with that character."

them were fired from State's Exhibit 36, and two were fired from a different firearm.

**{¶ 45}** After Monturo's testimony, the court advised the parties as follows at sidebar:

> * * * The only thing I wanted to reiterate is there was a motion in limine filed this morning which pretty much mirrored I think what was there before.   The only part that either wasn't there or that I hadn't caught before is there is case law where a police officer in a similar situation identified someone from a video and defense counsel made a distinction that that person knew the person for two years on and off, I don't think it was constant.   And he said that Detective Steele, it was a momentary like meeting and I just wanted to note for the record that based upon the history of this case - - while I don't know that they're intimate friends - - Detective Steele did have some dealings with the defendant because of the other case which will be tried after this one.
>
> And I just wanted to note that for the record that there was an interaction of some, you know, time.   And if the defendant wants to inquire into that, keeping it at a minimum, that other may come up (indiscernible) but for the record I think what, based on your motion in limine or the motion in limine by the defendant, I think the State was going to lead him a bit and just talk about previous associations with him noticing his walking, talking, whatever and not talk about the other case.

**{¶ 46}** Det. Steele then testified that he was a violent crimes detective with the MCSO, meaning he worked violent crimes such as homicides, shootings, and stabbings.

Steele testified that he responded to the Club after Freeman had been removed:

[PROSECUTOR] Q. Were you able to observe any of that surveillance video from [the Club] that early morning that you responded?

A. Yes.

Q. And when you watched that video, did you recognize any individuals from the video?

A. I did.

Q. Was that based on an interaction that you had previously had on January 26th of 2017?

A. It was.

Q. Who did you recognize based upon that interaction on January 26th, 2017?

A. I immediately recognized Shaun Hill walking through the bar area of [the Club].

* * *

Q. In that prior interaction on January 26th, 2017, had you been able to see Shaun Hill walking?

A. Yes.

Q. Had you seen his face?

A. Yes.

Q. Had you seen the sides of his face?

A. Yes.

Q. Had you had enough time on January 26th, 2017 to visualize

Shaun Hill?

A.  Yes.

* * *

Q.  * * * Was there a particular portion of the video that caught your eye first with respect to this identity of Shaun Hill?

A.  What caught my eye first is when I was showed that portion of the video, Shaun Hill was walking down through the bar area, I immediately recognized his face and kind of his demeanor, his walking demeanor and face.

{¶ 47} Det. Steele testified that Exhibits 22A, B, and C were screen shots he had printed from the video.  He testified that Hill was wearing "a very distinctive shirt" that allowed Steele to follow him throughout the video.  He testified as follows:

* * * I went back and I could see video all the way from when he comes in the door, walks through the bar, walks to the back dance club area, where he's escorted out, where he's walking down the front sidewalk, looks like he's turning back saying something to the bouncer.  I was able to follow him and his clothing all the way out around the side of the building to a car in the parking lot.  He goes to the car.  He gets out * * * looks like a gray sweatshirt type. I was able to keep following him.  He comes right back.  He's almost stopped by some people that he had come in with, brushes past them. * * * He comes around to the front and walks right up to Victim Freeman as Freeman is kind of looking away and I was able to just follow him over and he fires numerous shots at the victim striking the victim

and putting the victim down on the ground.

{¶ 48} Steele stated that he reviewed eight videos from different cameras and "was able to get a hold of our IT people and have them piece together, in order, * * * what was significant * * *" into one video, State's Exhibit 22. He stated that the portions included in State's Exhibit 22 were not altered in any way. He testified that approximately 45 minutes elapsed from the time Hill arrived at the Club until he shot Freeman. On a copy of the diagram of the scene, Steele identified the two casings from the gun of an unknown shooter and identified the other ones "from the found gun." Steele stated that, on February 21, 2017, Hill told him that Hill was at the Club on the morning of the shooting but was not involved in the fight or the shooting.

{¶ 49} On cross-examination, Det. Steele testified that he spent an "hour at least, two hours" with Hill on January 26, 2017. The court called counsel to the bench and indicated that Steele seemed to be trying to follow the court's direction not to mention the other criminal case and cautioned defense counsel, "if you keep questioning him, I don't know how he can answer you without something being blurted out." The court noted that it overruled the portion of the motion in limine addressed to Steele testifying from the video, and further indicated "whatever happens now I believe you are waiving any objection to what he says." Finally, the court indicated to defense counsel, "if you want to question him, I think he will continue to try and keep it out. All I'm saying is be careful. Whatever happens is on you."

{¶ 50} Defense counsel then asked Steele, "Your personal time speaking with Shaun Hill on January 26th was how long? How many minutes?" Steele responded, "A one-on-one conversation back and forth, I'd say approximately 45 minutes." Steele then

testified that when he arrived at the scene of the club shooting, Shiverdecker had already viewed the video and then identified Hill to him. Steele testified, "When I looked at the video, I knew it was Shaun Hill," and "it didn't matter what anybody else told me."

{¶ 51} At the close of the evidence, Hill moved for a Crim.R. 29 acquittal, and the court overruled the motion.

{¶ 52} The jury found Hill guilty of both counts of felonious assault, with firearm specifications, and having weapons while under disability. After merging the counts of felonious assault, the trial court sentenced Hill to an aggregate term of 14 years in prison.

{¶ 53} Hill raises five assignments of error on appeal. His first assignment of error is as follows:

THE TRIAL COURT ERRED IN OVERRULING HILL'S MOTION TO SUPPRESS.

{¶ 54} Hill argues that, considering "Steele's words to Hill at booking (we're going to escort you over to talk about the shooting, we'll show you the video), Steele's actions (taking Hill to/from the detective's section in anticipation he may be viewing a video or talking to his attorney) and the fact Hill did not get to see the video or his attorney," it was reasonably likely Hill would make a comment about his alleged involvement in the shooting.

{¶ 55} Hill also asserts that he invoked his *Miranda* rights, and Steele did not "scrupulously honor this invocation," because Steele still told Hill they would go across the street to talk and view the video. Steele also spoke to an attorney who informed Steele there would be no viewing of the video or any statements given, and the video was never shown to Hill.

{¶ 56} The State responds that, although Hill was in custody, he was not being interrogated at the time he made his statements. According to the State, the record affirmatively supports the trial court's conclusion that Hill's statements were spontaneous and not the result of interrogation.  The State notes that, while Steele "was aware that Hill had obtained counsel for the Hawthorn Suites shooting, he was not aware that Hill was represented by counsel on the Club Liquid charges."  The State asserts that *Miranda* did not apply.

{¶ 57} As this Court has previously noted:

In addressing a motion to suppress, the trial court assumes the role of the trier of fact.  *State v. Hollowell*, 2d Dist. Montgomery No. 24010, 2011-Ohio-1130, ¶ 20; *State v. Morgan*, 2d Dist. Montgomery No. 18985, 2002 WL 63196, *1 (Jan. 18, 2002), citing *State v. Curry*, 95 Ohio App.3d 93, 96, 641 N.E.2d 1172 (8th Dist.1994). The court must determine the credibility of the witnesses and weigh the evidence presented at the hearing.  *Hollowell* at ¶ 20.  In reviewing the trial court's ruling, an appellate court must accept the findings of fact made by the trial court if they are supported by competent, credible evidence. *Id.*  However, "the reviewing court must independently determine, as a matter of law, whether the facts meet the appropriate legal standard." *Id.*

* * *

Until suspects are "in custody," they do not have a right to warnings under *Miranda* [*v. Arizona*], 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 [1966].  *See, e.g., State v. Farris*, 109 Ohio St.3d 519, 2006-Ohio-3255,

849 N.E.2d 985, ¶ 13; *State v. Frady*, 142 Ohio App.3d 776, 780, 757 N.E.2d 12 (2d Dist.2001). Custodial interrogation is " 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.' " *State v. Roberts*, 32 Ohio St.3d 225, 226, 513 N.E.2d 720, n.1 (1987), quoting *Miranda*, 384 U.S. at 444. In order to determine if a person is in custody for purposes of *Miranda* the court must determine whether there was a formal arrest or a restraint on freedom of movement of the degree associated with a formal arrest. *State v. Hoffner*, 102 Ohio St.3d 358, 2004-Ohio-3430, 811 N.E.2d 48, ¶ 27, citing *California v. Beheler*, 463 U.S. 1121, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983)..

* * *

Interrogation includes express questioning as well as "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *State v. Fair,* 2d Dist. Montgomery 24120, 2011-Ohio-3330, ¶ 40, citing *State v. Strozier,* 172 Ohio App.3d 780, 2007-Ohio-4575, 876 N.E.2d 1304, ¶ 16 (2d Dist.) and *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). But "[p]olice officers are not responsible for unforeseeable incriminating responses." *Fair* at ¶ 40, citing *State v. Waggoner,* 2d Dist. Montgomery No. 21245, 2006-Ohio-844, ¶ 14. Statements made on the subject's own initiative, in the absence of questions or other conduct by police, do not

constitute "interrogation." *State v. Johnson,* 2d Dist. Montgomery No. 20624, 2005-Ohio-1367, ¶ 25, citing *City of Akron v. Milewski,* 21 Ohio App.3d 140, 487 N.E.2d 582 (9th Dist.1985).

*State v. Moody*, 2012-Ohio-3390, 974 N.E.2d 1273, ¶ 11-12, 16 (2d Dist.).

**{¶ 58}** We initially note that the trial court specifically found Det. Steele's testimony to be credible, and we defer to the trial court's assessment of credibility. Steele testified that he and Shiverdecker approached Hill at the jail after he was taken into custody on an arrest warrant at his arraignment on the Hawthorn Suites shooting; Steele handcuffed Hill and advised him that he and Shiverdecker were going to escort him to the special investigation's section to interview him about to the shooting. According to Steele, Hill advised Steele that he had an attorney, and Steele allowed Hill to make a phone call from the jail. Hill subsequently advised Steele that his attorney would meet them to watch the video. In the course of the walk across the street, Steele did not advise Hill of his rights or ask him any questions. Hill was allowed to speak to his attorney privately, and then after attorney Lennen phoned Steele, Hill was returned to the jail. Steele testified that he did not ask Hill any questions. Hill spontaneously volunteered that he was at the Club but not involved in the fight or the shooting. Steele testified that he did not ask any follow-up questions. Since Hill was not subject to custodial interrogation and spoke voluntarily, the trial court properly overruled his motion to suppress his statements. Accordingly, Hill first assignment of error is overruled.

**{¶ 59}** Hill's second assignment of error is as follows:

> THE TRIAL COURT ABUSED ITS DISCRETION IN FAILING TO REMOVE PROSPECTIVE JUROR [MR. K.] FOR CAUSE.

{¶ 60} Hill asserts the record demonstrates that prospective juror "Mr. K." had views on the weapons under disability count that prevented, or substantially impaired, his ability to perform the duties of a juror. The State responds that the trial court properly denied Hill's motion the challenge Mr. K. for cause because Mr. K. indicated he could follow the law and would not hold Hill's prior conviction against him.

{¶ 61} As this Court has noted:

R.C. 2945.25 [5] governs challenges for cause and allows for challenges of those who would favor one side over the other because of enmity or bias, and those who are otherwise unsuitable for any reason to be a juror. *State v. Reid,* Montgomery App. No. 19729, 2003-Ohio-6079, ¶ 51. A decision on a challenge to a prospective juror regarding his or her fairness, impartiality, or suitability constitutes reversible error only when the trial court is shown to have abused its discretion[6]; the court's ruling must be

---

[5] R.C. 2945.25 states:
A person called as a juror in a criminal case may be challenged for the following causes:
* * *
(B) That he is possessed of a state of mind evincing enmity or bias toward the defendant or the state; but no person summoned as a juror shall be disqualified by reason of a previously formed or expressed opinion with reference to the guilt or innocence of the accused, if the court is satisfied, from examination of the juror or from other evidence, that he will render an impartial verdict according to the law and the evidence submitted to the jury at the trial;
* * *
The validity of each challenge listed in this section shall be determined by the court.

[6] As noted in *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990):
"Abuse of discretion" has been defined as an attitude that is unreasonable, arbitrary or unconscionable. *Huffman v. Hair Surgeon, Inc.*

manifestly arbitrary and unsupported by substantial testimony. *State v.*
*Wilson* (1972), 29 Ohio St.2d 203, 211.

*State v. Buk-Shul*, 2d Dist. Montgomery No. 23603, 2010-Ohio-3902, ¶ 28.

**{¶ 62}** As noted by the Supreme Court of Ohio:

* * * The determination of juror bias necessarily involves a judgment
on credibility, the basis of which often will not be apparent from an appellate
record. *Wainwright v. Witt* (1985), 469 U.S. 412, 429, 105 S.Ct. 844, 854,
83 L.Ed.2d 841. For this reason, " * * * deference must be paid to the trial
judge who sees and hears * * * the juror." *Id.* at 426, 105 S.Ct. at 853.

*State v. DePew*, 38 Ohio St.3d 275, 280, 528 N.E.2d 542 (1988).

**{¶ 63}** In the course of voir dire, the following exchange occurred:

[DEFENSE COUNSEL]: * * * [A]t the end of the case the judge is going to
read you this instruction, all right.   It says that evidence was received that
the defendant was convicted of a past crime.

The evidence was received because a prior conviction is an element
of the offense charged.   It was not received, and you may not consider it to
prove the character of the defendant, nor to show that he or she acted in

---

(1985), 19 Ohio St.3d 83, 87, 19 OBR 123, 126, 482 N.E.2d 1248, 1252. It
is to be expected that most instances of abuse of discretion will result in
decisions that are simply unreasonable, rather than decisions that are
unconscionable or arbitrary.

A decision is unreasonable if there is no sound reasoning process
that would support that decision. It is not enough that the reviewing court,
were it deciding the issue de novo, would not have found that reasoning
process to be persuasive, perhaps in view of countervailing reasoning
processes that would support a contrary result.

conformity with that character.

* * *

But you're going to be told that you're really only supposed to consider it for one very limited purpose on one of the charges, and that you're not supposed to consider it to figure out whether or not he actually was the person that shot in this case. * * *

* * *

* * * [D]oes anyone have a concern about being able to follow that instruction and only consider that for a very limited purpose[?] * * * Tell us what you're thinking, Mr. [K.], it's all right.

PROSPECTIVE JUROR [MR. K.]: A little background first. I'm retired, of course. I worked for a firearm instruction company here in Montgomery County.

* * *

PROSPECTIVE JUROR [MR. K.]: One of the things that you said, Your Honor, was, one of the charges was under disability. That really concerns me.

* * *

PROSPECTIVE JUROR [MR. K.]: Simply because - - I guess I shouldn't assume that the individual knows that it's against the law to have a firearm, and have, as you said, a prior record of it.

* * *

PROSPECTIVE JUROR [MR. K.]: That's an issue to me, because

we teach people that come through our program, I drum it into them, the legal aspects of a firearm, use, care and so forth. I had to get - - I have been bothered with that since I've been sitting here, truthfully.

[DEFENSE COUNSEL]: No, we want you to talk about stuff like that. Well, would, - - the big question is, no one is saying that it's okay for somebody to break the law, to have some prior conviction and be carrying a gun around. No one is saying that's okay.

What we want to make sure is, that we think it, obviously from her standpoint, that if you don't consider that felony conviction to believe, oh, that must mean he's guilty, that you're going to see that he didn't do anything here. In other words, he didn't have the gun at all and didn't - - wasn't the person who shot anyone.

So we just need to make sure that thinking about that conviction in the back of your mind it's not going to be, oh, he's a bad guy. He must have done it, because he did something in the past. Do you see what I'm getting at?

PROSPECTIVE JUROR [MR. K.]: Right. I guess what I'm thinking is, if you can prove to me that he never had a weapon, that's different than that's established.

* * *

THE COURT: Having weapons, there are other elements like where it happened, the identity of the person, but I think what defense counsel is bringing up is there was a stipulation that there was a prior

conviction, which is one element. The other element is having the gun while you have that prior conviction.

And I think the question is, because of what you do and everything, if you hear that it's stipulated, it's agreed that the defendant had a prior conviction, will you automatically think he must have had a gun, or must the State prove beyond a reasonable doubt that this is the person who had the gun?

PROSPECTIVE JUROR [MR. K.]: But that's what I was - - maybe I didn't say it right. I understand that, that if he can prove that there was no firearm in his possession, that's different. I'm not looking at it as automatically.

THE COURT: Yeah, okay. Did that help?

[DEFENSE COUNSEL]: * * * Maybe that kind of brings us back to, if we can prove he didn't have a firearm, right, but wasn't the whole idea that they're the ones that have to prove that beyond a reasonable doubt, not only did he have a firearm but that he fired the firearm, right?

So because he's got - - this is okay.

[PROSECUTOR]: Objection.

THE COURT: Yeah. Sustained.

* * *

(At sidebar)

THE COURT: * * * I believe your confusion would be the language. What this gentleman was talking about was having weapons under

disability, and I believe the objection was, you said not only in the prior conviction, but that he fired the firearm.

That goes to the felonious assault, not having weapons under disability. Having weapons under disabilities is have, use, whatever, there are like five different things. And when you said that, and I think that was the objection - - what I heard was, for the having weapons under disability they have to prove he shot it.

[DEFENSE COUNSEL]: No, I - - so that was my mistake.

* * *

[DEFENSE COUNSEL]: I'm just trying to drill down the issue. It seems like he's now shifted the burden to us to prove that he didn't have a gun, because of a prior felony, and that's what I think is irrelevant.

THE COURT: I think the best way to ask it is, look, only talking about the weapons under disability - -

* * *

THE COURT: - - even if there's a stipulation, does the State have to prove that? And then I think the other thing you can ask all of them is, as to the felonious assault, that prior conviction has no place whatsoever.

So if you get those in specifically and directly, then you won't get into the confusion.

* * *

[DEFENSE COUNSEL]: * * * So, [Mr. K.], I think where we left off, let me be clear about this. So with regard to a prior record, right, can you

guarantee us that that is not going to have anything to do with the State proving whether or not he was in possession of a firearm and committed a felonious assault for this particular case?

PROSPECTIVE JUROR [MR. K.]: If the State proves that he had a firearm, yes. If they don't, I'm not prejudging him on his past, but that was - - that was a red flag to me right away when you talked about a firearm, and I knew all - - well, I know I don't know all about it, but I do know what under disability means.

THE COURT: Okay. Let me ask you a question.

PROSPECTIVE JUROR [MR. K.]: Yes, ma'am.

THE COURT: Because clearly you have history, you have experience in this. Can you follow the Court's instruction on that?

PROSPECTIVE JUROR [MR. K.]: Yes, ma'am.

THE COURT: * * * Because that's - - people have experience in different areas, but when it comes to the functions of the jurors and the function of the Court, the jurors determine the facts - -

PROSPECTIVE JUROR [MR. K.]: Uh-huh.

THE COURT: - - based upon the evidence, and then you apply your determination of the facts [to] the law as I give it to you. So when it comes to instructions on anything, my instructions for this case are the law, okay, and you have to follow those; any problem with that?

PROSPECTIVE JUROR [MR. K.]: No, ma'am.

{¶ 64} Defense counsel subsequently challenged Mr. K. for cause as follows:

[DEFENSE COUNSEL]: [Mr. K.], Your Honor, is the other one, number 11. I know he got to the point where it did seem as though it switched the burdens at that point once he heard about Shaun having a prior conviction.

And I know there were some attempts to rehabilitate him. I understand he said he could follow the law, but that's what - - frankly, that's what everybody says. I think his - - when you talk about his belief, based on someone who was sort of holding on to it for a while, was that this sort of firearm and experience in training he had was somehow going to affect.

So I think there is at least reasonable doubt, it's about the ability to follow the law.

THE COURT: Any response?

[PROSECUTOR]: I think that when the questions became more clear, he doesn't know what disability means. He didn't know how it applied to this case. But when you told him, "I will give you the instructions on that," he said he could follow the law.

THE COURT: I think he knew what a disability was. But I think your questioning was confusing, and I think when I said, "Do you understand that's separate and nothing to do with the felonious assault," he answered appropriately. So I think - -

[DEFENSE COUNSEL]: And, Your Honor, just one point if I could make if - -

THE COURT: Sure.

[DEFENSE COUNSEL]: I may? The only thing that he said, the direct quote that concerned me was, he said legal aspects are bothering me, while he's been sitting there. So if he feels that weapon's belief [sic], weapon's part is an illegal aspect, then that may taint the rest of his ability to, you know, decide the case.

THE COURT: Well, I watched him pretty closely - -

* * *

THE COURT: - - and I think he said from the beginning when he heard having weapons under disability it bothered him. Once we clarified that there are basically two elements that he has to be concerned about, the conviction - -

[DEFENSE COUNSEL]: True.

THE COURT: - - whether he had - - he was very clear, I thought, that it would not impact on the other two things. So I'll note that, and I'll rule on that one (phonetic).

{¶ 65} Defense counsel subsequently exercised a peremptory challenge to excuse Mr. K. After exhausting Hill's peremptory challenges, defense counsel requested an additional preemptory challenge "based upon the denial for the cause challenge on [Mr. K.]," and identifying an additional juror that the defense would excuse if given an additional challenge. The court denied the request, stating: "But you got [Mr. K.] off. I made my decision on him, so I think everything stands."

{¶ 66} We see no abuse of discretion in the court's denial of Hill's challenge of Mr. K. for cause. The court thoroughly advised Mr. K. that Hill's prior conviction was one

element of having weapons while under disability. The court asked Mr. K. if, given the stipulation to Hill's prior conviction, he would "automatically think he must have had a gun," and Mr. K. responded, "I'm not looking at it as automatically." The court subsequently explained to Mr. K. that the jury's function is to determine the facts from the evidence presented, and the court's function is to provide the law to apply to those facts, and Mr. K. indicated his ability to follow the court's instructions. The court also indicated that it "watched [Mr. K.] pretty closely," the court clearly found him credible, and we defer to the court's assessment of Mr. K's credibility. We note that while Hill requested an additional peremptory challenge, he does not argue in his brief that he was forced unnecessarily to exercise a peremptory challenge to excuse Mr. K., thereby reducing the number of his peremptory challenges. Hill's second assignment of error is overruled.

{¶ 67} Hill's third assignment of error is as follows:

THE TRIAL COURT ERRED BY ALLOWING DETECTIVE STEELE

[TO] IDENTIFY HILL ON SURVEILLANCE VIDEO.

{¶ 68} Hill asserts that Det. Steele's testimony about his previous interaction with Hill, which enabled Steele to identify Hill from the surveillance video, led to the conclusion or inference that Hill had a criminal record or was involved with violent crimes; thus, the probative value of Steele's testimony was substantially outweighed by the prejudicial effect it had on Hill's case. Hill asserts that, given Steele's explanation of his job and duties, "the inference presented was that Steele interacted with Hill in a violent crimes investigation."

{¶ 69} The State responds that the jury could have reasonably inferred that Hill was a witness to an unrelated offense or just a person Det. Steele came into contact with

during his daily activities. The State points out that Steele's testimony that he worked in the violent crimes section and his testimony regarding his prior interaction with Hill were "far removed from one another," and that Det. Steele's background and employment were identified "as a way to explain why he got involved in the shooting at the Club."

{¶ 70} Evid.R. 403(A) provides: "Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury."

{¶ 71} As this Court has noted:

> * * * [A] trial court has broad discretion in the admission or exclusion of evidence. *State v. Maurer* (1984), 15 Ohio St.3d 239, 265. In fact, a decision of the trial court to admit or exclude evidence "will not be reversed absent a showing of clear and prejudicial abuse of discretion." *Malone v. Courtyard by Marriott L.P.* (1994), 95 Ohio App.3d 74, 92, citing *O'Brien v. Angley* (1980), 63 Ohio St.2d 159, 163. * * *

*State v. Brown*, 2d Dist. Montgomery No. 18381, 2001 WL 280062, *1 (March 23, 2001).

{¶ 72} We see no abuse of discretion. We further conclude that Hill's assertion that Steele's testimony regarding his prior interaction with Hill led the jury to conclude that Hill had a criminal record is speculative. The trial court specifically instructed Steele not to discuss the nature of the interaction, and Steele followed the court's instruction, as the court noted at the start of cross-examination. Steele merely testified that he had a recent opportunity to observe and form a mental image of Hill's face and "walking demeanor." We note the court admonished defense counsel about ongoing questions about the interaction, noting "whatever happens now I believe you are waiving any objection to what

he says." We conclude that Hill's third assignment of error lacks merit, and it is overruled.

{¶ 73} Hill's fourth assignment of error is as follows:

THE TRIAL COURT ERRED BY NOT ALLOWING HILL TO WAIVE A JURY ON A SINGLE ELEMENT OF HIS WEAPONS UNDER DISABILITY CHARGE.

{¶ 74} Hill asserts that this court has previously interpreted the jury waiver statute and rule (R.C. 2945.05 and Crim.R. 23(A)) "to allow a written waiver of trial by jury as to a single element upon which a defendant wishes to prevent the state from offering proof in the presence of the jury, when the defendant stands upon his or her right to trial by jury on all other elements that the state must prove," and where the record includes a stipulation, at the defendant's request, of the element the defendant wishes to keep from the jury. Hill points out that he did not elect to waive his right to a jury in this case; instead, he "requested he be able to stipulate to the element of his having a prior conviction," citing *State v. Riley*, 98 Ohio App.3d 801, 649 N.E.2d 914 (2d Dist.1994) and Judge Donovan's concurring opinion in *State v. Wood*, 2d Dist. Clark No. 2016-CA-69, 2018-Ohio-875. He claims the trial court erred in denying this request to waive a jury on just one element, and he "was left with the alternative of agreeing to a stipulation according to *State v. Creech*," 150 Ohio St.3d 540, 2016-Ohio-8440, 84 N.E.3d 981.

{¶ 75} The State notes that Hill declined the opportunity to waive a jury on having weapons under disability, and thus the parties agreed to a stipulation regarding Hill's prior conviction. The State notes that while "*Riley* would seemingly permit a defendant to bifurcate the prior conviction element from the jury so long as there is a written jury waiver, notably, Hill refused a jury waiver." The state also noted that *Riley* has been criticized

by other courts and directs our attention to *State v. Bibler*, 2014-Ohio-3375, 17 N.E.3d 1154 (3d Dist.), the majority opinion in *State v. Wood*, and *State v. Sweeney*, 131 Ohio App.3d 765, 723 N.E.2d 655 (2d Dist.1999).

{¶ 76} In *Riley*, the defendant was indicted for aggravated trafficking in drugs, with a prior drug offense conviction. *Riley* at 803. Riley's prior conviction raised the degree of his offense from a third degree felony to a second degree felony. *Id.* Prior to trial, Riley stipulated to his prior conviction, and the court instructed the State to avoid reference to the prior conviction in its case-in-chief. *Id.* After Riley was found guilty of aggravated trafficking in drugs, the trial court issued an entry that provided: " ' It appearing to the court, by stipulation prior to trial, that the defendant was previously convicted of Aggravated Trafficking, the State was not required to present evidence of same during its case-in-chief.' " *Id.* at 804. On appeal, Riley argued that the trial court had erred " 'by sentencing him on the basis of a second-degree aggravated drug trafficking offense rather than a third-degree aggravated drug trafficking offense.' " *Id.* This Court concluded that "the trial court erred by removing from the jury's consideration the element of the prior conviction for a felony drug abuse offense, without a waiver signed by the defendant," but that the "error was harmless under the exceptional circumstances of his case." *Id.* at 805. This Court further concluded:

> Riley's counsel did have the authority to enter into stipulations of fact
> on his behalf. Exercising that authority, Riley's counsel stipulated, on the
> record, [to] the existence of the prior conviction. In the face of that
> stipulation, the jury, had it been required to consider the additional element
> of the existence of a prior conviction for a felony drug abuse offense, would

certainly have found for the state on that issue. Again, it is emphasized that the jury did not consider that additional element, the existence of which was a stipulated fact, at Riley's request, and for his protection in preventing the jury from possibly being prejudiced by the prior conviction.

*Id.*

{¶ 77} In *Bibler*, 2014-Ohio-3375, 17 N.E.3d 1154, the Third District considered an issue of first impression in that court, namely "whether a defendant may enter a partial plea of guilty by pleading to a single element of a crime – that is, fewer than all of the elements of an offense charged by a grand jury." *Id.* at ¶ 9. The Third District noted that *Riley* had concluded that a trial court "erred in removing the prior-conviction element from the jury's consideration without a proper waiver signed by the defendant." *Id.* at ¶ 47, citing *Riley* at 805. The Third District further noted that "a close reading of *Riley* indicates that the Second District did not contemplate a defendant waiving a jury trial on the prior-conviction element by pleading guilty to the element; rather the Second District contemplated waiving the requirement that a jury find the prior-conviction element exists when a defendant stipulates to that element." *Id.* at ¶ 48. The Third District found that the rationale in *Riley* was "contrary to law," that *Riley* was inapplicable to the facts of *Bibler,* and that the trial court improperly relied on *Riley* in allowing Bibler to plead guilty to the prior-conviction element and subsequently to preclude the State from presenting evidence of the prior-conviction element at trial based on Bibler's "written waiver." *Id.* at ¶ 50. The Third District concluded that "permitting a guilty plea to fewer than all of the elements of an offense creates a de facto bifurcated proceeding, which is prohibited by Ohio law. * * *." *Id.* at ¶ 51.

{¶ 78} Subsequent to *Riley,* this Court decided *Wood.* Therein, the defendant argued that "counsel was ineffective in failing to stipulate to his prior convictions, which 'should [have been] kept from the Jury,' " and that a stipulation to his prior conviction "would have 'in all probability' led to a different outcome." *Id.* at ¶ 50. In *Wood,* this Court stated:

> Wood incorrectly assumes that a stipulation would have kept all information about his prior convictions from the jury. Certain separate offenses may be severed for trial, where prejudicial evidence required to support one offense, such as having weapons under disability, is not relevant to other offenses. But the elements of a single offense generally cannot be severed, such that some elements are found by the jury and others are found by the trial court. A stipulation would have presented the information to the jury in a different way, but the jury would nonetheless have learned of the prior convictions.

*Id.* at ¶ 51.

{¶ 79} *Wood* also noted that "[c]ourts must be circumspect about the admission of evidence of prior bad acts." *Id.* at ¶ 53. This Court quoted the following from *Spencer v. Texas*, 385 U.S. 554, 575, 87 S.Ct. 648, 17 L.Ed.2d 606 (1967):

> Recognition to the prejudicial effect of prior-convictions evidence has traditionally been related to the requirement of our criminal law that the State prove beyond a reasonable doubt the commission of a specific criminal act. It is surely engrained in our jurisprudence that an accused's reputation or criminal disposition is no basis for penal sanctions. Because

of the possibility that the generality of the jury's verdict might mask a finding of guilt based on an accused's past crimes or unsavory reputation, state and federal courts have consistently refused to admit evidence of past crimes except in circumstances where it tends to prove something other than general criminal disposition.

This Court concluded that "the prior convictions in this case were admitted as an element of the offenses, not to show general or specific criminal disposition. Wood was not denied the effective assistance of counsel due to counsel's handling of his prior convictions." *Id.*

{¶ 80} The concurring opinion in *Wood* noted that, in *Riley*, this Court "seemingly embraced a defendant's right to keep a prejudicial element from the jury * * * with a stipulation and jury waiver * * *," citing *Bibler* and *State v. Miller*, 12th Dist. Warren No. CA 2011-02-013, 2012-Ohio-997, in a footnote, as contrary authority on the subject.

{¶ 81} In *Sweeney*, 131 Ohio App.3d 765, 723 N.E.2d 655, which was also decided after *Riley*, this Court denied Sweeney's application to reopen his direct appeal after his convictions for burglary and having weapons while under disability were affirmed, observing:

When Sweeney was indicted, a prior-conviction specification was added to the charges of aggravated burglary and carrying a concealed weapon. This specification arose from Sweeney's prior conviction for involuntary manslaughter. The prior conviction also served as the basis for the weapon-under-disability charge, because Sweeney was forbidden to have weapons as a result of his manslaughter conviction. Before trial,

Sweeney's counsel asked the court to remove from the jury's consideration the allegations of the prior manslaughter conviction in all three counts of the indictment. The court granted the request as to the first two counts (aggravated burglary and carrying a concealed weapon). However, the court refused to remove the manslaughter conviction allegation from count three (weapons under disability). In this regard, the court reasoned that the specifications on the weapon-under-disability charge could not effectively be separated when they, in essence, formed the elements of the weapon-under-disability charge. Thus, contrary to Sweeney's claim, his trial counsel did attempt to persuade the trial court to try at least part of the weapons-under-disability charge to the court, but was simply unsuccessful.

*Id.* at 772.

**{¶ 82}** This Court in *Sweeney* concluded:

In order to prove this charge against Sweeney, the state had to prove, beyond a reasonable doubt, that Sweeney was not relieved from disability as provided in R.C. 2923.14, that he knowingly acquired, had, carried, or used a firearm, and that he was under indictment for or had been convicted of any felony of violence, or had been adjudged a juvenile delinquent for commission of any such felony. Consequently, proving a prior conviction was an essential element of the crime of having a weapon under disability. See, also, *State v. Smith* (1990), 68 Ohio App.3d 692, 695-696, 589 N.E.2d 454, 456-457. Thus, the trial court correctly found that the prior conviction could not be separated from the weapon-under-disability charge.

Furthermore, neither the state nor the trial court is bound by a defense stipulation as to the existence of a conviction.[7] And a defendant is not entitled to bifurcated proceedings, nor may he waive jury trial on the prior-conviction element alone. *State v. Nievas* (1997), 121 Ohio App.3d 451, 700 N.E.2d 339; *State v. Allen* (1987), 29 Ohio St.3d 53, 29 OBR 436, 506 N.E.2d 199; and *Smith,* 68 Ohio App.3d at 695-696, * * *. As a result, Sweeney had no right to a separate trial on the prior-conviction element.

*Sweeney* at 772-73.

{¶ 83} We note that *Sweeney* has been followed by multiple jurisdictions. The Eleventh District has stated:

* * *[A] defendant is not entitled to birfurcate proceedings, nor may he waive jury trial on a prior conviction element alone. [*Sweeney* at 773]. In other words, in a jury trial, the jury, not the trial court, must determine the existence of a prior conviction as a factual matter beyond a reasonable doubt. * * * This Court has held that when a trial court accepts a defendant's invitation to bifurcate the proof, it abuses its discretion. * * *

*State v. Nadock,* 11th Dist. Lake No. 2009-L-042, 2010-Ohio-1161, ¶ 38; *see also State v. Casalicchio*, 8th Dist. Cuyahoga No. 79431, 2002-Ohio-587, *6; *State v. Ramsey*, 5th Dist. Richland No. 14CA90, 2015-Ohio-4812, ¶ 69; *State v. Sanders*, 3d Dist. Allen No. 1-09-01, 2009-Ohio-5437, ¶ 44.

{¶ 84} R.C. 2923.13(A)(3) provides:

---

[7] *See* ¶ 23, fn. 2, above, addressing the subsequent Supreme Court holding in *Creech,* 150 Ohio St.3d 540, 2016-Ohio-8440, 84 N.E.3d 981.

(A) Unless relieved from disability under operation of law or legal process, no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if any of the following apply:

* * *

(3) The person is under indictment for or has been convicted of any felony offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse or has been adjudicated a delinquent child for the commission of an offense that, if committed by an adult, would have been a felony offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse.

**{¶ 85}** Here, the trial court noted that Hill was charged with shooting Freeman with a gun while he was under a disability. As the trial court noted, Hill could have executed a jury waiver for the offense of having weapons under disability, thereby keeping his prior conviction from being introduced at trial in the absence of his testimony. Based upon the foregoing, we conclude that the trial court did not err by precluding Hill from waiving a jury on a single element of his weapons under disability charge.

**{¶ 86}** Hill's fourth assignment of error is overruled.

**{¶ 87}** Hill's fifth assignment of error is as follows:

THE VERDICTS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND WERE NOT SUPPORTED BY SUFFICIENT EVIDENCE.

**{¶ 88}** Hill argues that the witnesses who identified him in the surveillance video were not credible, because their prior interactions with him were "minimal at best."

Further, the security guards were in the midst of chaos when the altercation and shooting were occurring, and one of those witnesses only had one good eye and was a convicted felon. Moreover, there was testimony that at least three different persons fired weapons that night, and there was ballistic evidence from three different guns. No DNA or ballistic evidence linking Hill to a gun. There were no admissions made by Hill that he shot a gun or even possessed a gun, and the victim could not identify the shooter. The security guard within feet of the shooting was unable to observe the actual shooter. Based on these assertions, Hill contends that his convictions were not supported by sufficient evidence and were against the manifest weight of the evidence.

{¶ 89} The State responds that, although Hill's DNA was not found on the gun used to shoot Freeman, he also could not be excluded as a possible contributor. In addition to observing the testimony of the witnesses, the jury had the opportunity to view the surveillance video, observed Hill in court, and viewed a photograph of Hill displaying his appearance shortly after the shooting. Based on this evidence, the State argues that a reasonable factfinder could have concluded that the State proved beyond a reasonable doubt all the elements of the offenses, and Hill's convictions were not against the manifest weight of the evidence.

{¶ 90} As this Court has previously noted:

A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to sustain the verdict as a matter of law. *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). "The relevant inquiry is whether, after viewing

the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

In contrast, "a weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." *Wilson* at ¶ 12; *see Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 19. When evaluating whether a conviction is against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins* at 387, citing *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses. *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684 (Aug. 22, 1997). The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence. *Wilson* at ¶ 14. A judgment of conviction should be reversed as being against the manifest

weight of the evidence only in exceptional circumstances. *Martin* at 175.

*State v. Caldwell*, 2d Dist. Montgomery No. 27856, 2018-Ohio-4639, ¶ 4-6.

**{¶ 91}** We agree with the State. Having weapons while under disability has been defined above. R.C. 2903.11(A) defines felonious assault and provides: "(A) No person shall knowingly do either of the following: (1) Cause serious physical harm to another or to another's unborn; (2) Cause or attempt to cause physical harm to another or to another's unborn by means of a deadly weapon or dangerous ordnance."

**{¶ 92}** Marcellus Haynes testified that, as head of security for the Club, he was collecting cover charges at the main entrance on February 11, 2017, where he initially encountered Hill, and that he was subsequently called to the back of the Club about a fight. He testified that he escorted Hill out the door, noting his unique shirt. Haynes testified that the video footage captured "the defendant, his shirt, when he was running up, when he shot the man outside." On cross-examination, Haynes testified that he observed Hill's face and paid particular attention to him because he was not a regular customer, and "our new people, we just want to make sure that when they're coming in they're not going to cause an issue or trouble."

**{¶ 93}** Drewmar Threats testified that he observed a man brandish a weapon and fire two shots into the ground before fleeing. Threats testified that Andre Carter fired his weapon before it jammed. He testified that he observed a third man "walking up and brandishing another weapon which, at that point * * * he lets off two to three more shots at a guy that was standing right in front of the door, entrance." At the time, Threats stated that he was five to ten feet behind the shooter, whom he identified as Hill. Threats testified that he did not view Exhibit 22 (the surveillance video), and that his identification of Hill

was based on his "own two eyes."

{¶ 94} Det. Steele testified that he "immediately" recognized Hill on the surveillance video from an earlier interaction with him on January 26, 2017, during the course of which he observed Hill walking, his face, and the side of his face, all of which he recognized on the video. Like Haynes, Steele described Hill's "very distinctive shirt" that allowed Steele to follow him throughout the video from his entrance into the Club, to being in the bar area, to being involved in the disturbance and escorted out, to going to his car, and to returning to the front entrance of the Club and shooting Freeman. Steele testified that Hill acknowledged being at the Club at the time of the shooting, and that Shiverdecker also identified Hill on the video.

{¶ 95} Chris Monturo testified that State's Exhibit 33, the bullet from MVH, State's Exhibit 26, the bullet retrieved from the red jacket, and State's Exhibit 27, the bullet jacket in the key fob, were fired from State's Exhibit 36, the weapon found by Stumbo. He testified that four of the six shell casings in State's Exhibit 25 were also fired from State's Exhibit 36. While Mary Cicco testified that in testing the weapon, after it had been analyzed by the firearm section, she could "make no determination" with regard to Hill being a contributor; she also could not exclude him, "which means I've been looking at this mixed profile of a couple of individuals. I see possible DNA types that may have come from [Hill]; however, I cannot state that definitively."

{¶ 96} The testimonies of Freeman and Dr. Semon make clear that Freeman suffered serious physical harm.

{¶ 97} Finally, we have thoroughly reviewed the video and the still photos therefrom, and we conclude that they are consistent with the testimony of Haynes,

Threats, and Steele. Hill is seen entering the Club, being patted down and paying a cover charge to Haynes, walking through the bar area, being in the area of the disturbance, and being escorted out the door by Haynes. He is subsequently shown running from the building, entering a vehicle, reappearing at the front entrance of the Club, and shooting Freeman, who was wearing a red jacket, at close range. As the witnesses testified, Hill's tee shirt was unique and easy to pick out in the crowd of people. Further, he entered the Club with sunglasses on his head, and subsequently wore them over his eyes as he made his way about the Club. Hill appeared in the video to be short of stature and slight of build, with a distinct manner of walking.

**{¶ 98}** Having thoroughly reviewed the entire record, we conclude that Hill's convictions for felonious assault and having weapons while under disability were supported by sufficient evidence and were not against the manifest weight of the evidence. The jury clearly credited the testimony of the State's witnesses, and we defer to the jury's credibility assessment. Hill's fifth assignment of error is overruled.

**{¶ 99}** The judgment of the trial court is affirmed.

. . . . . . . . . . . . .

FROELICH, J. and TUCKER, J., concur.

Copies sent to:

Mathias H. Heck, Jr.
Heather N. Jans
Lucas W. Wilder
Hon. Barbara P. Gorman